IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WESTERN NONWOVENS, INC., et al.,[1] | ) | Case No. 08-11435 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. § 363
FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND
RETENTION OF CRG PARTNERS GROUP LLC TO PROVIDE
RESTRUCTURING SERVICES TO THE DEBTORS AND OF
JONATHAN J. NASH AS CHIEF EXECUTIVE OFFICER OF
THE DEBTORS NUNC PRO TUNC TO THE PETITION DATE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby submit this motion (the "Motion") for entry of an order authorizing the Debtors' employment of CRG Partners Group LLC ("CRG") to perform restructuring services for the Debtors and of Jonathan J. Nash as Chief Executive Officer of the Debtors pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") *nunc pro tunc* to the Petition Date (as defined below). The facts supporting the relief requested in this Motion are set forth in *Declaration of Jonathan J. Nash in support of Debtors' Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of CRG Partners Group Inc. to Provide Restructuring Services to the Debtors and of Jonathan J. Nash as Chief Executive Officer of the Debtors Nunc Pro Tunc to the Petition Date* (the "Nash

---

[1] The Debtors in these cases, along with the last four digits of each of the Debtor's federal tax identification number, are: Western Nonwovens, Inc. (9696); Western Synthetic Fiber, Inc. (1778); Bonded Fiberloft, Inc. (4998); Reliance Products, Inc. (0233); Paltex, Inc. (9988); Mid America Fiber Company, Inc. (2849); Florida Nonwovens, Inc. (1133); and Utah Nonwovens, Inc. (3204). The mailing address for all of the Debtors is 966 E. Sandhill Avenue, Carson, CA 90746.

Declaration") attached hereto as <u>Exhibit A</u>. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.

4. The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, are set forth in detail in the *Declaration of Jonathan J. Nash in Support of First Day Motions* (the "Nash Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

5. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Nash Declaration.

6. No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the Office of the United States Trustee.

**Relief Requested**

7. By this Motion, the Debtors seek to employ and retain (a) CRG to assist and perform restructuring services for the Debtors in these chapter 11 cases, and (b) Jonathan J. Nash, a partner at CRG, as Chief Executive Officer of each of the Debtors, each *nunc pro tunc* to the Petition Date, pursuant to section 363 of the Bankruptcy Code and on the terms set forth herein and in the engagement letter between the Debtors and CRG executed on July 9, 2008 (the "Engagement Letter"), except to the extent that the proposed form of order on this Motion provides otherwise. To the extent that there is a discrepancy between the Engagement Letter and the provisions of the proposed order, the latter provisions are intended to control. A copy of the Engagement Letter is attached hereto as Exhibit B and incorporated herein by reference.

8. Pursuant to the Engagement Letter, Mr. Nash will also serve as the Chief Executive Officer (the "CEO") of each of the Debtors. The CEO will oversee and assist the Debtors in their operations and manage the Debtors' business, operational and restructuring efforts and any potential wind-down and liquidation of assets, including negotiating with parties in interest, and coordinating the Debtors' employees and external professionals who are assisting the Debtors in their restructuring.

9. In accordance with the Engagement Letter, CRG will also provide staffing at various levels, to assist the CEO to guide the Debtors through Chapter 11. Mr. Nash will have direct oversight and control over the CRG professionals in these cases.

### Qualifications of Jonathan J. Nash as CEO

10. Mr. Nash is well-suited to provide the restructuring services required by the Debtors. He has been the CEO of WNI for approximately nine months and, in said capacity, has become intimately familiar with the Debtors' operations and businesses.

11. Further, Mr. Nash assists and advises operationally and financially distressed organizations through out-of-court workouts and chapter 11 reorganizations. Mr. Nash has been instrumental in a number of prominent restructurings, has assumed various senior executive and advisory roles, and has more than a decade of senior-management experience in a broad mix of companies and industries, including: petro-chemical, retail, industrial equipment, plastics, pulp and paper, automotive, and power generation. Among other matters, Mr. Nash was:

(i) CEO and CRO for an advertising specialties company that he successfully led through bankruptcy, reduced costs, grew EBITDA during a period of declining sales, and managed the marketing and sale of the assets to a financial buyer;

(ii) CEO for a Chinese company that produces sensors for a variety of industrial, medical and consumer applications, reorganized financial and operational areas, and made process and productivity improvements that led to record production and profitability levels;

(iii) Interim CFO for a retail chain acquired from bankruptcy and in such capacity, assisted with the completion of the purchase transaction and wind-down of the estate and reduced the store count, while increasing EBITDA and freeing cash trapped in inventory; and

(iv) Interim CEO of a specialty plastics manufacturer, where his operations experience and engineering training helped him increase production rates on three major production lines while reducing overall costs.

### Qualifications of CRG and Scope of Services of CRG and the CEO

12. The Debtors are familiar with the professional standing and reputation of CRG. CRG was retained prepetition to provide restructuring services to the Debtors, and Mr. Nash has served as the Debtors' CEO since on or about October 14, 2007. The Debtors understand that CRG, as well as Mr. Nash, have a wealth of experience in providing advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

13. Moreover, Mr. Nash and various other CRG employees have devoted substantial amounts of time and effort prepetition to, among other things, researching options relative to maximizing the enterprise value of the Debtors, advising and assisting the Debtors with respect to the potential sale of substantially all of their assets or other transactions, and supporting the Debtors' financial department in the management of its liquidity and working capital resources. CRG professionals were invaluable to the Debtors throughout this process and have played an instrumental role in their recent restructuring efforts to date.

14. Among other things, the CEO will provide assistance to the Debtors with respect to the management of their operations and businesses and their overall restructuring process, including any proposed sale or other disposition of the Debtors' assets for the benefit of creditors and developing an overall exit strategy for the Debtors in their chapter 11 cases.

15. Pursuant to the Engagement Letter, CRG will provide such business, restructuring and other services as CRG and the Debtors shall deem appropriate and feasible in order to advise and assist the Debtors in the course of these chapter 11 cases, including, but not limited to, the following areas:

- Financial and operational analysis of the Debtors' current and potential profitability, ongoing cash requirements, profit center contributions and break-even levels;

- Assistance to the Debtors in their relationships with existing lenders and creditors;

- Assistance to the Debtors in the management and enhancement of liquidity issues;

- Overall validation of the Debtors' business plan and turnaround strategy;

- An appraisal of the Debtors' basic systems, controls and operation procedures;

- Assistance with any sale or other disposition of the Debtors' assets for the benefit of economic stakeholders;

- Assistance in the prosecution of the Debtors' chapter 11 cases;

- Assistance in the potential development, proposal, negotiation and confirmation of any plan of reorganization; and

- Assisting with such other matters as may be requested that fall within CRG's expertise and that are mutually agreeable with the Board of Directors.

### Disinterestedness

16. To the best of the Debtors' knowledge and as disclosed herein and in the Nash Declaration, (a) CRG and Mr. Nash are "disinterested" within the meaning of section 101(14) of the Bankruptcy Code, and hold no interest adverse to the Debtors or their estates with respect to the matters as to which CRG and Mr. Nash are to be employed and (b) neither CRG

nor Mr. Nash have a connection to the Debtors, their creditors, or related parties except as disclosed in the Nash Declaration.

17. Specifically, CRG and Mr. Nash (a) are not creditors, equity security holders, or insiders of the Debtors (except as disclosed in the Nash Declaration), (b) are not and were not, within the two years before the Petition Date, directors, officers, or employees of the Debtors (except as disclosed in the Nash Declaration), and (c) do not have an interest materially adverse to the interest of the estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors.

18. Prior to the Petition Date, CRG provided advisory and other services to the Debtors commencing August 2007. Mr. Nash has served as the Debtors' CEO effective as of on or about October 14, 2007.

19. During the ninety day period prior to the Petition Date, CRG's fees and expenses relating to services rendered by CRG to the Debtors were approximately $566,763.81. The Debtors have satisfied all the fees and expenses of CRG through regular payments of CRG's invoices, and CRG does not have a prepetition claim against the Debtors.

20. Notwithstanding the efforts described in the Nash Declaration to identify and disclose CRG's connections with any parties in interest in these Chapter 11 cases, because the Debtors are large enterprises, CRG is unable to state with certainty that every client relationship or other connection has been disclosed in the Nash Declaration. In this regard, if CRG or Mr. Nash discovers additional material information that it determines requires disclosure, CRG will file a supplemental disclosure with the Court.

## Compensation Terms

21. CRG and the Debtors have entered into the Engagement Letter[3] to govern the relationship between them. CRG has agreed to provide the CEO and other professionals all of whom have a wide range of skills and abilities related to this type of assignment. With respect to the CEO and the staff who will be assisting the CEO, CRG will be compensated at the following hourly rates:

| Professional | Rate Per Hour |
|---|---|
| Jonathan Nash, Partner | $425 |
| Peter Richter, Director | $350 |
| Jeremy Bailey, Director | $325 |

22. As noted in the Engagement Letter, CRG personnel's hourly rates will range from $175-$530 depending on the staff member assigned to the engagement. In accordance with the normal billing practices of CRG, these hourly billing rates are revised periodically in the ordinary course of CRG's business. Pursuant to the Engagement Letter, all fees and expenses incurred are payable weekly to CRG without the need for CRG to file fee applications with the Bankruptcy Court. CRG will, however, file monthly statements of its fees and expenses and parties in interest shall have the right to object to fees paid when quarterly reports of compensation earned are filed with the Court. The Debtors request that the Court order that any such objection must be filed within twenty (20) days of the filing of the quarterly report.

---

[3] Notwithstanding anything to the contrary in the Engagement Agreement, CRG will not seek payment of the 4.5% administrative fee referenced in paragraph 1(b) of the Appendix – General Terms and Conditions to the Engagement Agreement.

23. In addition to the compensation set forth above, the Debtors shall pay directly or reimburse CRG upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment by CRG in providing the services as outlined herein.

24. While neither CRG, nor the CEO are being employed as professionals under section 327 of the Bankruptcy Code such that they would be subject to the compensation requirements of sections 330 and 331 of the Bankruptcy Code, CRG will submit monthly statements to the United States Trustee and any official committee appointed in these cases for services rendered and expenses incurred as described above and the Debtors will be authorized to pay, in the ordinary course of their business, the amount invoiced by CRG for fees and expenses on a weekly basis. Such parties shall have the right to object to fees paid when quarterly reports of compensation earned are filed with the Court, provided that any such objection shall be filed within twenty (20) days of the filing of the quarterly report.

25. As of the Petition Date, CRG held a retainer from the Debtors in the amount of $50,000 (the "Retainer"), which was paid by the Debtors pursuant to the Engagement Letter. If the Retainer is unused as of the Petition Date, the retainer will be applied against unpaid invoices at the completion of the engagement and returned to the Debtors. CRG will maintain reasonably detailed records of any actual and necessary costs and expenses incurred in connection with services rendered.

26. Finally, the Engagement Letter provides:

> If during the course of this agreement, the Company asks CRG to restructure its existing debt, or find merger partners and/or buyers for the Company's assets, each and every transaction will warrant a success fee due to CRG of 2% of any

transaction or all cumulative transactions in excess of $10 million, plus 3% of the cumulative transaction value over $15 million, plus 4% of the cumulative transaction value over $20 million, plus 5% of the cumulative transaction value over $25 million. These fees will be payable upon court order and will be in addition to the hourly fee arrangements already in place.

*See* Engagement Letter, p. 2. As set forth in the proposed order on this Motion, "success fees, transaction fees, or other back-end fees shall be approved by the Court at the conclusion of the case on a reasonableness standard and are not being pre-approved by entry of this Order; no success fee, transaction fee or back-end fee shall be sought upon conversion of the case, dismissal of the case for cause, or appointment of a trustee ...." At the appropriate time, a separate motion or other pleading will be submitted for approval of any success fee, if any, proposed for CRG under the Engagement Letter.

### Indemnification and Other Provisions

27. Although the *General Terms and Conditions*[4] attached to the Engagement Letter contain an indemnification provision, notwithstanding anything in the Engagement Letter or the attachments thereto to the contrary, the Debtors will not indemnify CRG in connection with this case, *provided, however*, as set forth in the proposed order, the Debtors are permitted to indemnify any and all CRG personnel who are appointed by the Debtors as officers of the Debtors, including Mr. Nash, the Debtors' CEO, on the same terms as provided to the Debtors' other officers and directors under the corporate bylaws and applicable state laws, and any CRG personnel who are appointed by the Debtors as officers of the Debtors may be named on the Debtors' directors and officers insurance policies and may be named on the Debtors' employment practices rider to the directors and officers insurance.

---

[4] *See* paragraph 8 of the *Standard Terms and Conditions* attached to the Engagement Letter (Exhibit B hereto).

28. Further, CRG will comply with certain other terms and provisions as set forth in the attached, proposed form of order on this Motion, which have been requested by the Office of the U.S. Trustee in other recent cases involving a motion like this one.

**Authority for the Relief Requested**

29. The Debtors request that the Court authorize the employment of CRG and the CEO *nunc pro tunc* to the Petition Date pursuant to the terms of the Engagement Letter and the proposed order, in the ordinary course of business.

30. Section 363(c) of the Bankruptcy Code authorizes the Debtors to enter into certain transactions and use property of the estate in the ordinary course of business. The retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code. Numerous courts have authorized retention of officers utilizing this provision of the Bankruptcy Code. *See, e.g., In re Global Motorsport Group, Inc., et al.,* Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 28, 2008) (Carey, J.); *In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (PJW) (Bankr. D. Del. February 28, 2007) *In re Global Home Products, LLC,* et al., Case No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re Meridian Automotive Systems- Composite Operations, Inc., et al.,* Case No. 05-11168 (MFR) (Bankr. D. Del. July 19, 2005); *In re Cable & Wireless USA, Inc.,* Case No. 03-13711 (CGC) (Bankr. D. Del. Jan. 16, 2004); ); *In re Bridgeport Holdings,* Case No. 03-12825 (Bankr.D.Del. 2003) (Walsh, J.); *In re SHC, Inc.,* Case No. 03-12002 (Bankr.D.Del. 2003) (Walrath, J.); *In re Exide Technologies, et al.,* (Case No. 02-11125) (JCA) (Bankr. D. Del. May 10, 2002); *In re Bill's Dollar Stores, Inc.,* Case No. 01-0435 (PJW) (Bankr. D. Del. 2001); *In re Integrated*

*Health Services, Inc.*, Case No. 00-389 (MFW) (Bankr. D. Del. 2000). *See also In re WorldCom Group, et al.*, (Case No. 02-13533) (AJG) (Bankr. S.D.N.Y. September 17, 2002)

31. Once a debtor articulates a valid business justification, "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company'". *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. VanGorkom*, 488 A2d 858, 872 (Del. 1985). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *In re Integrated Resources, Inc.*, 147 B.R. 650- 656 (S.D.N.Y. 1992) (quoting *Smith v. VanGordom* 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 615 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

32. The Debtors submit that the employment of CRG and Mr. Nash under the terms of the Engagement Letter and proposed order would inure to the benefit of the Debtors' estates and their creditors. Moreover, both CRG and Mr. Nash are clearly qualified for the positions for which they are being employed. The Debtors have determined that the compensation terms of the Engagement Letter are within the range for senior executive officers employed with companies of comparable size, value and reputation. Accordingly, the Debtors' decision to enter into the Engagement Letter, as modified to limited extent by the provisions of the proposed order, reflects an exercise of the Debtors' sound business judgment.

## Notice

33.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Debtors' prepetition and postpetition lenders; and (c) each of the Debtors' thirty-five largest unsecured creditors (on a consolidated basis). Following the first day hearing in this case, this Motion will be served on (a) the Office of the United States Trustee; (b) the Debtors' prepetition and postpetition lenders or their counsel; (c) each of the Debtors' thirty-five largest unsecured creditors (on a consolidated basis); and (d) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: July 14, 2008

                                       Western Nonwovens, Inc.; Western Synthetic Fiber, Inc.; Bonded Fiberloft, Inc.; Reliance Products, Inc.; Paltex, Inc.; Mid America Fiber Company, Inc.; Florida Nonwovens, Inc.; and Utah Nonwovens, Inc.

*/s/ Michael Wood*

By: Michael Wood
Title: Chief Financial Officer