# EXHIBIT A

ASSET PURCHASE AGREEMENT

dated as of August 20, 2008

between

Sylvan Chemical Co., Inc.

(as "Buyer")

and

Western Nonwovens, Inc.;

Mid-America Fiber Company, Inc.;

Western Synthetic Fiber, Inc. and

Florida Nonwovens, Inc.

(collectively, as "Seller")

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................................1
 Section 1.1 Defined Terms .............................................................................................1
 Section 1.2 Other Definitional Provisions .....................................................................14

ARTICLE II TRANSFER OF ASSETS AND LIABILITIES .........................................14
 Section 2.1 Assets to be Acquired .................................................................................14
 Section 2.2 Excluded Assets ..........................................................................................17
 Section 2.3 Liabilities to be Assumed by Buyer ...........................................................18
 Section 2.4 Excluded Liabilities ....,..............................................................................19
 Section 2.5 Reserved......................................................................................................21

ARTICLE III CLOSING AND PURCHASE PRICE .....................................................21
 Section 3.1 Closing; Transfer of Possession; Certain Deliveries ..................................21
 Section 3.2 Purchase Price..............................................................................................23
 Section 3.3 Allocation of Purchase Price........................................................................24

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER....................25
 Section 4.1 Brokers and Finders .....................................................................................25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ......................25
 Section 5.1 Organization and Good Standing..................................................................25
 Section 5.2 Execution and Effect of Agreement..............................................................25
 Section 5.3 No Contravention..........................................................................................26
 Section 5.4 Third Party Approvals...................................................................................26
 Section 5.5 Brokers and Finders ......................................................................................26
 Section 5.6 Funds..............................................................................................................26

ARTICLE VI COVENANTS OF THE PARTIES ...........................................................26
 Section 6.1 Conduct of Business Pending the Closing....................................................26
 Section 6.2 Bankruptcy Court Order ...............................................................................29
 Section 6.3 Notification of Certain Matters.....................................................................29
 Section 6.4 Access ........................................................................................................... 30
 Section 6.5 Leases.............................................................................................................31
 Section 6.6 Confidentiality; Privacy ...............................................................................34
 Section 6.7 Public Announcements ..................................................................................34
 Section 6.8 Cure of Defaults............................................................................................ 34
 Section 6.9 Employment Matters......................................................................................35
 Section 6.10 Further Agreements ......................................................................................35
 Section 6.11 Payment of Transfer Taxes and Tax Filings .................................................35
 Section 6.12 Reserved....................................................................................................... 36
 Section 6.13 Proration of Taxes.........................................................................................36
 Section 6.14 Reasonable Efforts; Notification...................................................................36
 Section 6.15 Rejected Contracts ........................................................................................36

i

## Table of Contents
### (continued)

Section 6.16 Adequate Assurances ........................................................37
Section 6.17 Further Assurances............................................................37
Section 6.18 Post-Closing Reconciliation..............................................37
Section 6.19 Assignment Assistance ......................................................37

ARTICLE VII CONDITIONS TO OBLIGATIONS OF THE BUYER..........................38
Section 7.1 Conditions Precedent to Obligations of Buyer ...................38

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER........................39
Section 8.1 Conditions Precedent to the Obligations of Seller.............39

ARTICLE IX TERMINATION....................................................................40
Section 9.1 Termination of Agreement..................................................40
Section 9.2 Consequences of Termination.............................................42

ARTICLE X MISCELLANEOUS .................................................................43
Section 10.1 Expenses ...........................................................................43
Section 10.2 Assignment .......................................................................43
Section 10.3 Parties in Interest..............................................................43
Section 10.4 Risk of Loss ......................................................................44
Section 10.5 Notices ..............................................................................44
Section 10.6 Choice of Law...................................................................46
Section 10.7 Entire Agreement; Amendments and Waivers .................46
Section 10.8 Acknowledgment and Release...........................................46
Section 10.9 Counterparts......................................................................46
Section 10.10 Invalidity...........................................................................46
Section 10.11 Headings ...........................................................................47
Section 10.12 Exclusive Jurisdiction.......................................................47
Section 10.13 WAIVER OF RIGHT TO TRIAL BY JURY.................47
Section 10.14 Beneficiaries .....................................................................47
Section 10.15 Counting............................................................................47
Section 10.16 Preparation of this Agreement ..........................................47
Section 10.17 Termination of Representations, Warranties and Covenants.........47

**Schedules:**
I - Owned Software
II - Material Contracts
2.1(b) - Capital Equipment Leases
2.1(c) - Acquired Equipment
2.1(d) - Acquired Intellectual Property
2.1(g) - Assumed Contracts
2.2(j) - Excluded Intellectual Property
2.3(e) - Seller Delivery Obligations Assumable by Buyer
6.1(m) – Permitted Pre-Closing Modifications to Contracts

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 20th day of August, 2008, by and between Sylvan Chemical Co., Inc., a Delaware corporation and a wholly-owned subsidiary of Milliken & Company (the "Buyer"), and Western Nonwovens, Inc., a Delaware corporation, Western Synthetic Fiber, Inc., a Delaware corporation, Mid-America Fiber Company, Inc., a Missouri corporation, and Florida Nonwovens, Inc., a Delaware corporation (collectively, the "Company" and the "Seller").

## WITNESSETH:

WHEREAS, Seller is in the business of (i) designing, manufacturing and selling carded and cross lapped, thermally bonded high loft nonwoven fire barriers, other carded and cross lapped thermally bonded high loft nonwoven batting, and carded and cross lapped thermally bonded compressed high loft nonwoven pads, and (ii) designing, manufacturing and selling other products at the Seller Plants, in each case described in clauses (i) and (ii), (the "Business")

WHEREAS, Seller commenced a case (the "Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") on or about July 14, 2008 by filing a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Seller wishes to sell to Buyer certain of the assets of the Business as specified herein, and Buyer wishes to purchase such assets and to assume those liabilities relating to the Business specified herein, all on and subject to the terms and conditions set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, Seller and Buyer have determined that it is in their respective best interests to consummate the foregoing transaction, and in furtherance thereof, have approved this Agreement and the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Accounts Receivable" shall mean any and all accounts receivable due and owing from any of the Seller's customers relating to the Business, and all other accounts receivable related to the Business, including the Acquired Accounts Receivable.

"Acquired Accounts Receivable" shall mean any and all undisputed accounts receivable owed to Seller by Simmons or its Affiliates related to the Business.

"Acquired A/R Benchmark" shall have the meaning ascribed to such term in Section 3.2(b).

"Acquired Claims" shall have the meaning ascribed to such term in Section 2.1(r).

"Acquired Equipment" shall have the meaning ascribed to such term in Section 2.1(c).

"Acquired Intellectual Property" shall have the meaning ascribed to such term in Section 2.1(d).

"Acquired Inventory" shall have the meaning ascribed to such term in Section 2.1(h).

"Acquired Inventory Benchmark" shall have the meaning ascribed to such term in Section 3.2(b)

"Acquired Software/Hardware" shall have the meaning ascribed to such term in Section 2.1(d).

"Acquired Vehicles" shall have the meaning ascribed to such term in Section 2.1(j).

"Affiliate" shall mean, with respect to a Person other than Buyer, all Persons controlling, controlled by, or under common control with, such Person and, (i) with respect to Buyer shall mean Milliken & Company and its direct and indirect subsidiaries including Buyer and (ii) with respect to Simmons shall mean Simmons Bedding Company and its direct and indirect subsidiaries, including Simmons.

"Agreement" shall mean this Agreement (together with all schedules and exhibits referenced herein).

"Allocation Schedule" shall have the meaning ascribed to such term in Section 3.3.

"Alternate Transaction" shall mean a transaction or transactions pursuant to which Seller, in one or a series of transactions, sells, transfers, leases, subleases or otherwise disposes, directly or indirectly, of any portion of the Purchased Assets and the sale of which would otherwise be consummated pursuant to this Agreement (other than the sale of Inventory in the ordinary course of business), including any transaction

2

through any other asset sale, stock sale, debt-for-equity swap, joint venture, financing, reorganization or recapitalization, confirmation of a plan of reorganization or a going-concern sale through a plan of liquidation in the Case, or any similar transaction, in each case that would not involve a sale or disposition of the Purchased Assets to Buyer.

"Approval Order" shall have the meaning ascribed to such term in Section 8.1(c).

"Assumed Agreements" shall have the meaning ascribed to such term in Section 6.16.

"Assumed Contracts" shall have the meaning ascribed to such term in Section 2.1(g).

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.3.

"Assumption and Assignment Agreement" shall mean the Assumption and Assignment Agreement entered into by and between Buyer and Seller in customary form reasonably acceptable to Buyer and Seller.

"Avoidance Actions" shall have the meaning ascribed to such term in Section 2.2(c).

"Bankruptcy Code" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Court" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA), and all severance, employment, change in control, fringe benefit, bonus, incentive, deferred compensation, and all other employee benefit plans, programs, policies, agreements and other arrangements, whether or not subject to ERISA, including any funding vehicle therefor now in effect or required in the future to be established as a result of the transactions contemplated by this Agreement, whether formal or informal, written or oral, binding or not, under which any present or former employee of Seller or any beneficiary or dependent of such employee, has any present or future right to benefits, contingent or otherwise.

"Bill of Sale and Assignment" shall mean a Bill of Sale and Assignment from Seller for the benefit of Buyer in customary form reasonably acceptable to Buyer and Seller.

3

"Business" shall have the meaning ascribed to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the state of New York are authorized or obligated by law or executive order to close.

"Buyer" shall have the meaning ascribed to such term in the preamble.

"Capital Equipment Leases" shall mean the Equipment Leases set forth on Schedule 2.1(b).

"Capital Equipment Lease Payoff" shall mean the amount specified in writing by Seller prior to the Closing as the amount sufficient to effectuate the buyout of equipment contemplated by Sections 7.1(i) and 8.1(g) below; provided, however, in no event shall the Capital Equipment Lease Payoff exceed seven hundred twenty-five thousand dollars ($725,000.00).

"Capital Equipment Lease – Sauget" shall mean the Capital Equipment Lease for Equipment located at Seller's Plant at Sauget, Illinois.

"Capital Equipment Lease – St. Louis" shall mean the Capital Equipment Lease for Equipment located at the St. Louis Plant.

"Case" shall have the meaning ascribed to such term in the Recitals.

"Cash and Cash Equivalents" shall mean cash, third-party checks, wire transfers and any other funds of Seller, and commercial paper, marketable securities, certificates of deposit and other bank deposits, treasury bills and other cash equivalents of Seller calculated in accordance with GAAP.

"Claims" shall have the meaning ascribed to such term in Section 2.2(c).

"ClimaShield" shall mean the branded business of Seller focused on continuous filament insulation material for the outdoor recreation, military, and home / hospitality markets made at Seller's Clinton, TN facility.

"Clinton Plant" shall mean that certain plant located in Clinton, Tennessee that is leased by Seller and utilized in the operation of the Business.

"Closing" shall have the meaning ascribed to such term in Section 3.1(a).

"Closing Date" shall have the meaning ascribed to such term in Section 3.1(a).

"Closing Statement" shall have the meaning ascribed to such term in Section 3.2(b).

4

"Closing Time" shall have the meaning ascribed to such term in Section 3.1(a).

"COBRA" shall mean Section 4980B of the Code and Part 6 of Title I of ERISA, together in each case, with applicable regulations, in each case, as amended and in effect from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Company" shall have the meaning ascribed to such term in the preamble.

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including, without limitation, financial information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and data bases, but shall not include any information that (i) is generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), (ii) is already in the recipient's possession or comes into recipient's possession on a non-confidential basis (other than as a result of disclosure in violation of this Agreement), or (iii) is independently developed by the receiving party without reliance in any way on any Confidential Information.

"Content" shall mean any literary, audio, video, and other information, including editorial content, data, animation, graphics, photographs and artwork, and combinations of any or all of the foregoing, in any tangible or digital formats.

"Contract" shall mean, with respect to the Business, any lease, license, agreement, contract, contract right, purchase order, obligation, trust, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property.

"Copyright Assignment" shall mean the Copyright Assignment entered into by and between Buyer and Seller in customary form reasonably acceptable to Buyer and Seller.

"Cure Amounts" shall mean all amounts payable by Seller or Buyer, as applicable pursuant to the Agreement, pursuant to Section 365(b)(1)(A) or (B) of the Bankruptcy Code.

"Database Assets" shall mean the computer databases related to the Business and related storage units necessary to transfer such computer databases to Buyer's possession or control.

"Deposit Escrow" shall mean the $610,000 deposited by Buyer with the Escrow Agent pursuant to Section 3(b)(v) of the Bidding Procedures set forth in Exhibit A to the Order of the Bankruptcy Court for the Case dated July 29, 2008 (I) authorizing

5

and approving bidding procedures to be employed in connection with the sale; (II) approving break up fee and expense reimbursement; (III) scheduling an auction and hearing to consider approval of the sale; and (IV) approving form and manner of sale hearing [Re: Docket No. 20].

"Eligible Inventory" shall mean (i) all saleable finished Inventory of a type for which Seller has filled outstanding purchase orders in the normal course of business, within 90 days prior to the Closing Date, (ii) all useable raw materials and work in process that is convertible in the normal course into such saleable finished Inventory, and (iii) all supplies, including wrap and pack supplies; provided, however, that Eligible Inventory shall exclude the Excluded Inventory.

"Employee Obligations" shall mean salary, wages, sick pay, accrued bonuses, severance, deferred compensation, Liabilities relating to any Benefit Plan, Liabilities of Seller arising under COBRA, and all other Liabilities of Seller to its present or former employees (including any such employees who become employees of Buyer) or retirees or spouses, dependents or other beneficiaries of such present or former employees or retirees, whether pursuant to agreements, plans or otherwise.

"Environmental Laws" shall mean all Laws relating to protection of human health and the environment, including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. (S)(S) 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. (S)(S) 6901 et seq., (the "Resource Conservation and Recovery Act", the Toxic Substances Control Act, 15 U.S.C. (S)(S) 2601, et seq., the Clean Water Act, 33 U.S.C. (S)(S) 51 et seq., the Oil Pollution Act, 33 U.S.C. (S)(S) 2701 et seq., the Clean Air Act, 42 U.S.C. (S)(S) 7401 et seq. and the Occupational Safety and Health Act, 29 U.S.C. (S)(S) 651 et seq., and state and local equivalents of all of the foregoing.

"Equipment" shall mean all leasehold improvements, furniture, fixtures, equipment, Lab Equipment, machinery, parts and spare parts of such machinery, supplies and other tangible personal property owned by Seller that is located at or relates to the Business and, to the extent transferable, and all warranties, licenses, releases, service agreements and contractual commitments, if any, express or implied, existing for the benefit of Seller in connection therewith.

"Equipment Leases" shall mean all equipment leases used in the Business, including any leases for Lab Equipment.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Escrow Agent" shall mean Seller's legal counsel, the law firm of Pachulski, Stang, Ziehl & Jones, LLP.

"Excess Receivables" shall have the meaning ascribed to such term in Section 3.2(c).

6

"Excluded Accounts Receivable" shall have the meaning ascribed to such term in Section 2.2(n).

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2.

"Excluded Equipment" shall have the meaning ascribed to such term in Section 2.2(k).

"Excluded Intellectual Property" shall have the meaning ascribed to such term in Section 2.2(j).

"Excluded Inventory" shall have the meaning ascribed to such term in Section 2.2(o).

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.4.

"Excluded Permits" shall have the meaning ascribed to such term in Section 2.2(p).

"Final Order" shall mean an Order of the Bankruptcy Court or other court of competent jurisdiction (i) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or other proceeding for review, rehearing or reargument, (ii) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (iii) respecting which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure and other applicable Laws.

"FR Product" shall mean ammonium polyphosphate treated products of a type historically produced by Seller.

"GAAP" shall mean United States generally accepted accounting principles, and Seller's historical practices, consistently applied.

"Governmental Directive" shall have the meaning set forth in Section 4.7.

"Governmental Entity" shall mean any (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal); or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Independent Accounting Firm" shall mean KPMG LLP.

"Initial Agreement Date" shall mean the date on which the parties mutually execute and deliver this Agreement.

"Intellectual Property" shall mean: (i) all intangible proprietary rights or interests, however denominated, throughout the world, whether express or implied, whether or not registered or recorded, including all patents, all inventions, technology, processes, algorithms and formulae (whether patentable or not) and Trademarks, all proprietary data, databases, research and development data and customer data, all domain names, rights of privacy and publicity, moral rights, shop rights, all trade secrets and know-how, all published and unpublished works of authorship (whether copyrightable or not) and any copyrights therein and thereto, all computer software (including process control software), source code and object code, and all documentation related thereto, and licenses received from manufacturers and sellers of the Equipment; (ii) all filings, recordations and governmental awards or registrations pertaining to the above, including patents and applications therefor, trademark registrations and applications therefor, copyright registrations and applications therefor, domain name registrations and applications therefor; (iii) all causes in action and other rights arising from or relating to the above, including maintenance rights or rights to upgrades, rights to sue and collect remedies against past, present and future infringements or misappropriations thereof, and rights of priority and protection of interests therein under the laws of any jurisdiction worldwide, including rights to obtain renewals, continuations, divisions or other extensions of legal protections pertaining thereto; (iv) to the extent permitted by applicable law, all rights under section 365(n) of the Bankruptcy Code arising from or relating to the above; and (v) all tangible embodiments of the above, including, without limitation, all filings and correspondence with governmental authorities, all original governmental certificates for such patents and trademark and copyright registrations, and all files and filings pertaining to any litigation, opposition proceeding, cancellation proceeding, arbitration, mediation, or negotiation arising from or relating to the above.

"Inventor Patent Assignment" shall mean the inventor executed assignments for all U.S. patent applications related to the Business.

"Inventory" shall mean all merchandise or other goods sold, or intended to be sold at the Seller Plants and related to the Business, all raw materials purchased by Seller or located in the Seller Plants or elsewhere that is necessary to, or purchased in connection with, the Business and the operation thereof, all supplies, including wrap and pack supplies, and all merchandise or other goods produced by the Seller Plants for the Business, the production of which has not been completed as of the Closing Date, and shall not include Equipment or any parts.

"Inventory Excess" shall have the meaning ascribed to such term in Section 3.2(d).

"Inventory Shortfall" shall have the meaning ascribed to such term in Section 3.2(d).

8

"IP Contracts" shall have the meaning ascribed to such term in Section 2.1(d).

"Knowledge" with respect to any individual, shall mean the actual, current knowledge of such individual. The "Knowledge of Seller" shall mean the Knowledge of the following persons: Jon Nash, Peter Richter, Mike Wood, Dan Dobbins, Jim Delpiano, Tom Taylor, Sherri McGuire and Nancy Haas.

"Lab Equipment" means Horizontal and Vertical Burn Cabinets, Hunter Color Eye – Devices, Initial Load Detection Machines, Measurematics, Sample Cutters, Clicker Presses and Dies, and Lab Scales, which are used in the operation of the Business.

"Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Lenders" shall mean Heller Financial, Inc. and its respective predecessors, successors and assigns.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, security interest, mortgage, deed of trust or other monetary encumbrance.

"Material Adverse Effect" shall mean: (i) any event, change, condition or effect which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or is reasonably likely to be, materially adverse to the Purchased Assets or the Business taken as a whole; or (ii) any change in federal law or regulation having the effect of relieving Buyer and its affiliates of the need to require FR Product; provided, however, for purposes of this Agreement, neither (xx) the commencement of the Case and the restrictions on Seller's activities and operations resulting therefrom, and the reasonably anticipated consequences thereof, nor (yy) the loss of goodwill or customers of the Business (including, without limitation, any loss of goodwill or customers resulting from the winding down and closing of other facilities and operations of Sellers not included among the Purchased Assets) shall be deemed a "Material Adverse Effect".

"Material Contracts" shall mean those Contracts (together with all amendments thereto) with respect to the Business that are described on **Schedule II**.

"Notice" shall have the meaning ascribed to such term in Section 10.5.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation or award of any Governmental Entity or private arbitration tribunal.

"OSHA" shall have the meaning ascribed to such term in Section 4.17.

"Owned Software" shall mean that software which is listed on **Schedule I** hereto.

"Patent Assignment" shall mean the Patent Assignment by and between Buyer and Seller in customary form reasonably acceptable to Buyer and Seller.

"Pending Purchase Orders" shall have the meaning ascribed to such term in Section 2.3(e).

"Permits" shall have the meaning ascribed to such term in Section 2.1(e).

"Permitted Access Parties" shall have the meaning ascribed to such term in Section 6.5(c).

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, joint stock company, labor union, estate, Governmental Entity or other entity.

"Petition Date" shall mean July 14, 2008, which is the date on which Seller filed its voluntary petition for relief under the Bankruptcy Code.

"Plant Lease Maintenance Period" has the meaning ascribed to such term in Section 6.5(b).

"Post-Closing Cooperation Period" shall have the meaning ascribed to such term in Section 6.4(c).

"Post-Petition Period" means any period of time beginning with the time at which Seller filed its voluntary petition for relief under the Bankruptcy Code on the Petition Date.

"Prepaid Amounts" means deposits and other prepaid amounts of Seller or its Business.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Professional Expenses" shall mean the legal and other professional fees of Seller's estate in connection with the Case (including professionals for Seller and for the committee of unsecured creditors), and all fees and expenses incurred by CRG

Partners in connection with the sale of the Purchased Assets or otherwise in providing services to Seller.

"Profit & Loss Statements" shall have the meaning ascribed to such term in Section 4.16.

"Purchase Price" shall have the meaning ascribed to such term in Section 3.2.

"Purchased Assets" shall have the meaning ascribed to such term in Section 2.1. Notwithstanding anything to the contrary in any other provision of this Agreement, any equipment, goods, articles, assets, or other property of any kind or nature held, used or controlled by Seller pursuant to a Contract shall only be included in the transaction contemplated herein to the extent that the associated Contract is assumed and assigned to Buyer pursuant to the Approval Order entered by the Bankruptcy Court and then, only to the extent of Seller's interest therein.

"Quality Reports" shall mean, to the extent (i) in existence as of the Initial Agreement Date and (ii) in Seller's possession or control, all data, files, video, DVD and related documents and information, in whatever format, relating to the testing and performance of any goods that Seller or any of its affiliates, subsidiaries, or predecessors previously purchased or otherwise provided to Buyer and other customers, including, without limitation, all data and files relating to flammability testing of any such goods, blend ratio and chemistry for same, all production quality control data and all related documents, including Seller's certificates of analysis, all files and records relating to flammability material produced by Seller, and Seller's certificate of analysis for each customer of fire retardant goods produced at the Seller Plants.

"Real Property Leases" shall mean the real property leases of the Seller Plants.

"Receivables Shortfall" shall have the meaning ascribed to such term in Section 3.2(c).

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Resource Conservation and Recovery Act" shall have the meaning ascribed to such term in the definition of Environmental Laws.

"St. Louis Plant" shall mean that certain plant located in St. Louis, Missouri that is leased by Seller and utilized in the operation of the Business

"Sale Hearing" Shall mean the hearing to consider entry of the Approval Order.

"Sale Motion" shall have the meaning ascribed to such term in Section 6.2(c).

"Seller" shall have the meaning ascribed to such term in the preamble.

"Seller's Adjustment Certificate" shall have the meaning ascribed to such term in Section 3.3(b).

"Seller's Cure Payment" shall have the meaning ascribed to it in Section 2.4(m).

"Seller's Disclosure Schedule" shall mean Seller's disclosure schedule dated July 13, 2008 delivered to Simmons in connection with the Simmons APA.

"Seller Plants" shall mean those plants which are presently owned or leased by the Seller and utilized in the operation of the Business.

"Simmons" shall mean SBC Manufacturing Co. LLC.

"Simmons APA" shall mean that certain Asset Purchase Agreement dated July 13, 2008 between Simmons and Seller.

"Simmons Break-up Fee" means any Break-up Fee, as defined in the Simmons APA, that the Bankruptcy Court in the Approval Order determines is owed by Seller to Simmons under the Simmons APA as a result of the consummation of the transactions contemplated in this Agreement.

"Simmons Expense Reimbursement" means any Expense Reimbursement, as defined in the Simmons APA, that the Bankruptcy Court in the Approval Order determines is owed by Seller to Simmons under the Simmons APA as a result of the consummation of the transactions contemplated in this Agreement.

"Statement of Fixed Assets" shall have the meaning ascribed to such term in Section 4.16.

"Tax" or "Taxes" shall mean any current, deferred, federal, state, county, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, without limitation, income, profits, gains, net worth, sales and use, *ad valorem*, gross receipts, business and occupation, license, minimum, alternative minimum, environmental, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition to tax or interest on the foregoing.

"Tax Claims" shall have the meaning ascribed to such term in Section 2.2(d).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademark Assignment" shall mean the Trademark Assignment by and between Buyer and Seller in customary form reasonably acceptable to Buyer and Seller.

"Trademarks" shall mean, to the extent of Seller's interest therein, all foreign and domestic trademarks, service marks, trade names (including the name "Western Nonwovens"), trade dress, logomarks, domain names, and other brand identifiers or indicia of origin, along with all goodwill associated therewith and symbolized thereby, and all registrations, applications to register, recordations and governmental filings, arising therefrom or pertaining thereto, in all territories throughout the world and arising under any applicable legal regime, whether common law, statutory, administrative, or other applicable regulation, grant, or order. Without limitation, such "Trademarks" include all trademarks, service marks and trade names and the registrations and applications therefor listed on Schedule 2.1(d).

"Transfer Tax" or "Transfer Taxes" shall mean any federal, state, county, local, foreign and other sales, excise, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable law under the laws of any state.

"Website" shall mean (i) the website currently located at the URL http://www.westernnonwovens.com, (ii) all other websites owned or controlled by Seller, and all Content and pages contained within each of those websites, hosted anywhere in the world, and (iii) all website user information and data collected by Seller, including email addresses, website logs, clickstream data and cookies, but, in each case, excluding freely available graphic or text content, such as clip art or graphic images licensed from commercial media vendors. For each Website, the Content and pages shall include all computer files and documentation for the current version of the Website and all archived Content and pages in Seller's possession or control. Notwithstanding the foregoing, for purposes of this Agreement, the terms "Website" and "Content" shall specifically exclude any attorney-client privileged data and information, records, content, images or the like contained or reflected therein or thereon that are unrelated to the Business.

Section 1.2     Other Definitional Provisions.

(a)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(f)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     All references to "$" and dollars shall be deemed to refer to the United States currency.

(h)     All references to any financial or accounting terms shall be defined in accordance with GAAP except as otherwise specifically defined herein.

## ARTICLE II

## TRANSFER OF ASSETS AND LIABILITIES

Section 2.1     Assets to be Acquired.   At the Closing, and upon the terms and conditions set forth herein and subject to the approval of the Bankruptcy Court pursuant to the Approval Order, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept, all of the right, title and interest of Seller, free and clear of all Liens, claims and interests, in, to and under each and all of the Purchased Assets.   "Purchased Assets" shall mean all right, title and interest of Seller in, to and under the following assets at the Closing Time, but shall exclude the Excluded Assets as set forth in Section 2.2:

(a)     Reserved;

(b)     All Equipment leased by the Company pursuant to the Capital Equipment Leases set forth in Schedule 2.1(b) and purchased by the Company prior to or at Closing as contemplated in Section 6.5(a);

(c)     All furniture, fixtures, equipment, and machinery set forth on Schedule 2.1(c), and all parts and spare parts of such machinery and related supplies and, to the extent transferable, and all warranties, licenses, releases, service agreements and contractual commitments, if any, express or implied, existing for the benefit of Seller in connection therewith, (collectively, the "Acquired Equipment");

(d)     To the extent transferable pursuant to the Approval Order, all of Seller's right, title and interest in or to all Intellectual Property, other than the Excluded Intellectual Property, owned by Seller, or licensed to Seller, or otherwise controlled by Seller, and used in or for the operation of the Business, held for use in the Business, or otherwise related to the Business (the "Acquired Intellectual Property"), including , but not limited to, the Intellectual Property listed on Schedule 2.1(d), also including, but not limited to, all cases of: (i) registered Trademarks, including applications therefor; (ii) unregistered Trademarks; (iii) patents, pending patent applications and completed invention disclosures being considered by Seller for patentability; (iv) trade secrets or know how; (v) registered copyrights, including applications therefor; (vi) unregistered copyrights or works of authorship; (vii) software; (viii) material data; (ix) Contracts concerning Intellectual Property (the "IP Contracts"); (x) the Owned Software; (xi) all phone numbers and phone and other telecommunication lines; (xii) the Website; and (xiii) the Content, in each of the above cases, being used in, held for use in, or related to the Business;

(e)     Reserved;

(f)     The Acquired Accounts Receivable, but specifically excluding any Excluded Accounts Receivable;

(g)     To the extent transferable pursuant to the Approval Order, the Contracts listed on Schedule 2.1(g) (the "Assumed Contracts");

(h)     All Inventory of Seller as of the Closing Date or in transit to or from, any Seller Plants, and, to the extent transferable and assignable, all warranties, licenses, releases and agreements, if any, express or implied, existing for the benefit of Seller in connection therewith, but specifically excluding Excluded Inventory (the "Acquired Inventory");

(i)     Copies of the minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller and copies or originals of all books, samples, records, files or papers of Seller, whether in hard copy or electronic format, relating to the Purchased Assets and/or to the on-going operation of the Business, including, without limitation, sales and promotional literature, manuals and data, Quality Reports, samples and retains from previous production runs, all production and Quality Reports related thereto, sales

15

and purchase correspondence, customer lists, vendor lists, mailing lists, catalogues, research material, URLs, know-how, specifications, designs, drawings, processes and quality control data, patent filings and any other related documentation, or any other intangible property and applications for the same, engineering information, test results, plans, personnel and employment records (other than records with respect to former employees or employees who do not become employees of Buyer as of or after the Closing Time), technical information, diagrams, maintenance schedules, operating and production records, safety and environmental reports, data, studies and documents, fixed asset ledgers, Tax Returns (other than income Tax Returns) regarding real property, personal property and *ad valorem* taxes with respect to the Purchased Assets, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns; provided, however, the Purchased Assets shall specifically exclude any of the foregoing to the extent the same is (i) subject to any applicable attorney-client privilege, and/or (ii) not transferable under applicable law.

(j)     Reserved;

(k)     To the extent Buyer has not been compensated for such loss, destruction or condemnation by way of Purchase Price adjustment or otherwise, the amount of and all rights to any insurance proceeds received or entitled to be received by Seller after the Initial Agreement Date in respect of the loss or destruction or condemnation of any Purchased Asset occurring after the Initial Agreement Date and prior to the Closing Time;

(l)     Reserved;

(m)     To the extent transferable, all rights of Seller under all warranties (expressed or implied), representations, indemnities, or guaranties made by third parties to or for the benefit of Seller with respect to the Purchased Assets;

(n)     All claims of Seller against Buyer or its Affiliates other than claims under this Agreement as of the Closing Date.

(o)     Reserved;

(p)     To the extent transferable and assignable, all of Seller's customer relationships with customers of the Business;

(q)     The Database Assets;

(r)     All Claims that Seller or any of its Affiliates may have against Buyer or any of its Affiliates (together with, to the extent transferable, all rights of Seller under all warranties (expressed or implied), representations, indemnities, or guaranties made by third parties to or for the benefit of Seller and exclusively relating to the Purchased Assets, collectively, the "Acquired Claims");

(s)     Reserved; and

16

(t)     All goodwill related to the foregoing.

Section 2.2     Excluded Assets.  In addition to any assets or properties expressly excepted or excluded from any category of the Purchased Assets in Section 2.1 above, Seller shall retain, and Buyer shall not purchase, Seller's right, title and interest in or to any of the following assets and properties of Seller (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of Seller, free and clear of any Claim of Buyer:

(a)     All Cash and Cash Equivalents as of the Closing Time;

(b)     All Contracts other than the Assumed Contracts and the Acquired Intellectual Property;

(c)     All rights, demands, claims, actions and causes of action (collectively, the "Claims") that Seller or any of its Affiliates may have against any third party (other than Buyer or any of its Affiliates), including any Governmental Entity, under Chapter 5 of the Bankruptcy Code or otherwise (collectively, the "Avoidance Actions"), including, without limitation, any and all rights, claims and causes of action of Seller that are not Acquired Claims, including without limitation all rights, claims and causes of action of Seller against former officers, directors, employees, members, principals, agents, and representatives of Seller;

(d)     All Claims that Seller or any of its Affiliates may have against any Person (including Governmental Entities) for refund or credit of any type with respect to Taxes accrued with respect to periods ending on or prior to the Closing Time (collectively, "Tax Claims");

(e)     Except as provided in Section 2.1(k), all insurance policies, insurance claims and proceeds of insurance policies owned by Seller;

(f)     All rights of Seller under this Agreement and the agreements and instruments delivered to Seller by Buyer pursuant to this Agreement or the transactions contemplated hereby;

(g)     The company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller;

(h)     Seller's directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other Benefit Plan;

(i)     Assets owned or used by Seller not related to the Business;

(j)     Any Intellectual Property relating exclusively to Seller's Climashield product line, including without limitation, the Intellectual Property listed on Schedule 2.2(j) (the "Excluded Intellectual Property");

(k)     Any Equipment other than the Acquired Equipment (the "Excluded Equipment");

(l)     All capital stock of Seller, including any options, warrants or other securities exchangeable or convertible into capital stock of Seller;

(m)     Seller's bank accounts;

(n)     any Accounts Receivable except for the Acquired Accounts Receivable (the "Excluded Accounts Receivable");

(o)     any Inventory related to the Seller's Climashield line of products and all Inventory of Seller as of the Closing Date located at, or in transit to or from, the Clinton Plant or the St. Louis Plant and all warranties, licenses, releases and agreements, if any, express or implied, existing for the benefit of Seller in connection therewith (the "Excluded Inventory");

(p)     any Permit; and

(q)     any Prepaid Amounts.

Section 2.3     Liabilities to be Assumed by Buyer.  At the Closing, Buyer will assume only the following Liabilities of Seller (the "Assumed Liabilities") and no others:

(a)     Reserved;

(b)     all Liabilities expressly assumed by Buyer pursuant to any other provision of this Agreement; and

(c)     all Liabilities of Seller which arise after the Closing Time to the counter-parties under the Assumed Contracts and the Acquired Intellectual Property; provided, however, that Buyer does not assume and does not agree to pay, discharge or perform any Excluded Liabilities as described in Section 2.4 below;

(d)     any Liabilities for Transfer Taxes to the extent provided in Section 6.12 below;

(e)     those obligations of Seller to fulfill delivery obligations under purchase orders issued to vendors and suppliers by Seller or accepted by Seller from customers in the ordinary course of business which are both (A) listed on Schedule 2.3(e) and (B) as to which (i) Seller is not in default of its obligations thereunder, (ii) such purchase orders have not been performed, (iii) with respect to customer purchase orders, Seller has not received payment pursuant to such purchase order and any Inventory

necessary to fulfill such purchase orders is in the Buyer's possession or may be purchased in the ordinary course of business in time to deliver any goods due pursuant to such purchase order, and (iv) delivery pursuant to the terms of such purchase orders is within the thirty (30) days following the Closing Date (the "Pending Purchase Orders"); and

        (f)     Reserved.

        Section 2.4    Excluded Liabilities. Other than the Assumed Liabilities, Buyer shall not and does not assume any other Liability whatsoever (including Liabilities relating to the conduct of the Business or to the Purchased Assets (and the use thereof) at any time on or prior to the Closing Time), whether relating to or arising out of the Business or Purchased Assets or otherwise, fixed or contingent, disclosed, or undisclosed (collectively, the "Excluded Liabilities"). Without limiting the foregoing, Buyer shall not and does not assume any of the following (each of which shall be included within the definition of "Excluded Liability"):

        (a)     Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities of Seller which are based on any Liabilities arising out of any breach by Seller of any provision of any Assumed Contracts or obligations pertaining to Acquired Intellectual Property, purchase orders or sales orders including any Liabilities for non-payment, non-delivery, breach of warranty or other breach of contract, or failure to deliver specified product or any issues related to blend materials used or quality of product delivered.

        (b)     All Liabilities relating to or arising, whether before, on or after the Closing, out of or in connection with, any of the Excluded Assets, including all Liabilities relating to or arising out of any Contract that is not an Assumed Contract or Acquired Intellectual Property;

        (c)     Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities, other than the Assumed Liabilities, that arise (whether under the Assumed Contracts, the Acquired Intellectual Property or otherwise) with respect to the Purchased Assets or the use thereof on or prior to the Closing Time or relate to periods ending on or prior to the Closing Time or are to be observed, paid, discharged or performed on or prior to the Closing Time (in each case, including any Liabilities that result from, relate to or arise out of tort or other product liability claim);

        (d)     Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all litigation and related claims and Liabilities or any other claims against Seller of any kind or nature whatsoever, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to Seller's conduct, performance or non-performance, failure to deliver specified product, or product delivered with quality issues or issues related to blend materials);

        (e)     All Employee Obligations;

        (f)     All Liabilities relating to any environmental, health or safety matter (including any Liability or obligation arising under any Environmental Law)

arising out of or relating to Seller's operation of the Business or other of the Seller's respective businesses or Seller's leasing, ownership or operation of real property;

(g)     All Liabilities for damages to persons or property arising out of alleged defects in products sold by Seller, or arising under warranties, express or implied, issued by Seller;

(h)     All Liabilities of Seller under any collective bargaining agreement, including, without limitation, the current collective bargaining agreement between Sellers and UFCW Local 1176 with respect to that certain plant located in Carson, California that is leased by Seller, any agreement with any labor union, any employment agreement or any severance agreement;

(i)     All Liabilities of Seller attributable to, incurred in connection with, arising from, or relating to, a violation of any Laws governing employee relations, including anti-discrimination Laws, wage and hour Laws, labor relations Laws and occupational safety and health Laws and the WARN Act;

(j)     All Liabilities of Seller related to the termination by Seller of employment of any employees of Seller, including all Liabilities for severance or arising under the WARN Act;

(k)     Except as set forth in Section 6.11, all Liabilities for any and all Transfer Taxes due as a result of the transactions contemplated by this Agreement;

(l)     Except as set forth in Section 6.11 and subject to Section 6.13, all Liabilities for any and all Taxes of Seller for any period, including deferred Taxes and any other Taxes relating to the operation of the Business or the ownership of the Purchased Assets on or before the Closing Time, whether assessed prior to, or following, the Closing, and whether the amount is determined by audit, reassessment or otherwise;

(m)     All Cure Amounts payable in order for Seller to fulfill its obligations under this Agreement (the "Seller's Cure Payment");

(n)     Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities of Seller that were incurred or accrued prior to the Petition Date, including, without limitation, all notes, bonds or other evidences of indebtedness;

(o)     All Liabilities of Seller to the Lenders;

(p)     All Liabilities of Seller in respect of any indebtedness for borrowed money, intercompany indebtedness or any notes provided by Seller;

(q)     All Liabilities of Seller arising out of guarantees or indemnities by Seller or any Affiliates of Seller;

(r)     All Professional Expenses; and

20

(s)     Except for those Liabilities specifically assumed by Buyer pursuant this Agreement, all Liabilities for fraud, breach, misfeasance, negligence, strict liability in tort, injury to persons or property or under any other theory relating to the Business, the Purchased Assets or the conduct, performance or non-performance of Seller.

Section 2.5     Reserved.

## ARTICLE III

## CLOSING AND PURCHASE PRICE

Section 3.1     Closing; Transfer of Possession; Certain Deliveries.

(a)     Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to Article IX hereof, the closing of the transactions contemplated herein (the "Closing") shall take place at 12:01 a.m. (eastern standard time) on a date mutually acceptable to Buyer and Seller (the "Closing Date") to be mutually agreed upon by the parties, which date shall be two (2) Business Days after all the conditions set forth in Articles VII and VIII hereof (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing) shall have been satisfied or waived), but in any event no later than August 25, 2008, unless another time or date is agreed to in writing by the parties. The Closing shall be held at the offices of such place as is mutually agreed to by the parties. The Closing shall be effective as of 12:01 a.m. (New York time) on the Closing Date (the "Closing Time").

(b)     At the Closing, the Seller shall deliver, or shall cause to be delivered, to Buyer the following:

(i)     a duly executed Bill of Sale and Assignment;

(ii)     Reserved;

(iii)     the Assumption and Assignment Agreement with respect to all Assumed Contracts, duly executed by Seller;

(iv)     the Trademark Assignment, duly executed by the Seller, including a separate Trademark Assignment suitable for recording with regard to each jurisdiction and each recordable right or interest, such as each Trademark registration, each application to register a Trademark, or each recorded or recordable license interest;

(v)     the Copyright Assignment, duly executed by the Seller, including a Copyrights Assignment covering unregistered copyrights and a separate Copyright Assignment suitable for recording with regard to each jurisdiction and each recordable right or interest, such as each copyright registration, each application to register a copyright, or each recorded or recordable license interest;

(vi)     the Patent Assignment, duly executed by the Seller, including a separate Patent Assignment suitable for recording with regard to each jurisdiction and each recordable right or interest;

(vii)    an incumbency and specimen signature certificate, dated as of the Closing Date, from Seller with respect to the officer or officers of Seller executing this Agreement and any other documents delivered hereunder by or on behalf of Seller;

(viii)   a certificate of Seller, dated as of the Closing Date, signed by an authorized officer of Seller, certifying that conditions specified in Section 7.1(a) and Section 7.1(b) hereof have been fulfilled;

(ix)     a copy of the resolutions adopted by the Board of Directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of Seller as of the Closing Date in a manner appropriate under the Seller's organizational documents;

(x)      all Quality Reports, certificate of analysis data for each of Seller's customers of the Business, and all records and files related to Seller's patents and patent applications related to the Business;

(xi)     all other instruments reasonably requested by Buyer of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as are desirable or necessary to convey the Purchased Assets to Buyer; and

(xii)    such other closing instruments and certificates as may be reasonably requested by Buyer.

(c)      At the Closing, Buyer shall deliver, or shall cause to be delivered to or for the benefit of the Seller, the following:

(i)      a wire transfer of federal funds to the account or accounts designated by Seller (which account or accounts shall be designated at least two (2) Business Days prior to the Closing Date) of the Purchase Price less the Deposit Escrow, less the Capital Equipment Lease Payoff, less the amount of the Simmons Break-up Fee, if any, and less the amount of the Simmons Expense Reimbursement, if any;

(ii)     wire transfer of federal funds from Escrow Agent to Seller (to the account designated by Seller pursuant to Section 3.1(c)(i) above) in an amount equal to the amount of the Deposit Escrow, plus all accrued interest thereon;

(iii)    wire transfer of federal funds to the account or accounts designated by Simmons of any Simmons Break-up Fee;

(iv)     wire transfer of federal funds to the account or accounts designated by Simmons of any Simmons Expense Reimbursement;

(v)     wire transfer of federal funds to the account or accounts designated by the lessor under the Capital Equipment Leases an amount equal to the Capital Equipment Lease Payoff;

(vi)     the Assumption and Assignment Agreement, duly executed by Buyer;

(vii)     an incumbency and specimen signature certificate, dated as of the Closing Date, from Buyer with respect to the officer or officers of Buyer executing this Agreement and any other documents delivered hereunder by or on behalf of Buyer;

(viii)     a certificate of Buyer, dated as of the Closing Date, signed by the President or Chief Financial Officer of Buyer, certifying that conditions specified in Section 8.1(a) and Section 8.1(b) hereof have been fulfilled;

(ix)     a copy of the resolutions adopted by the Board of Directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by the Secretary or an Assistant Secretary of Buyer as of the Closing Date; and

(x)     such other closing instruments and certificates as may be reasonably requested by Seller.

Section 3.2     Purchase Price.

(a)     The purchase price hereunder (the "Purchase Price") shall be an amount in cash equal to (i) eleven million two hundred thousand Dollars ($11,200,000), plus or minus, as applicable, (ii) the adjustments contemplated in this Section 3.2.

(b)     Seller and Buyer acknowledge and agree that the Purchase Price has been based on (i) Acquired Accounts Receivable being $220,000 (the "Acquired A/R Benchmark"), and (ii) the Acquired Inventory having a value of $1,100,000 (the "Acquired Inventory Benchmark"). Within five (5) business days after the Closing Date, Seller shall prepare and deliver to Buyer a statement of Acquired Accounts Receivable and Acquired Inventory, prepared in accordance with generally accepted accounting principals, consistently applied, as of the Closing Date (the "Closing Statement"). Buyer's accountant shall be permitted to have reasonable access to the books, records and work papers containing financial information of Seller during the period in which the Closing Statement is being prepared to verify the accuracy and completeness thereof. The fees and expenses of Buyer's accountant shall be borne solely by Buyer, and the fees and expenses of Seller's accountants shall be borne solely by Seller. The Closing Statement shall be conclusive and binding upon Buyer and Seller unless Buyer objects in writing to any item or items shown on the Closing Statement within fifteen (15) days after the delivery of the Closing Statement. Such writing shall

23

assert that the Closing Statement is in error specifying in reasonable detail the amount in dispute and the basis for such dispute. If the parties do not agree within fifteen (15) days thereafter as to the amount in dispute, such amount or amounts shall be submitted to the Bankruptcy Court for resolution and final determination.

(c)     In the event that the Acquired Accounts Receivable on the Closing Date as finally determined in the manner provided in this Section 3.2 (x) is less that the Acquired A/R Benchmark (the amount by which such Acquired Accounts Receivable are less than the Acquired A/R Benchmark, the "Receivables Shortfall"), the Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the Receivables Shortfall, or (y) is greater than the Acquired A/R Benchmark (the amount by which such Acquired Accounts Receivable are greater than the Acquired A/R Benchmark, the "Excess Receivables"), the Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the Excess Receivables. Promptly after the final determination of the Acquired Accounts Receivable pursuant to this Section 3.2, but in any event no more than five (5) business days after such determination, (x) the Escrow Holder shall pay to Buyer from the Purchase Price Adjustment Deposit, an amount equal to the Receivables Shortfall, if any, and (y) Buyer shall pay to Seller an amount equal to the Excess Receivables.

(d)     In the event that the value of the Acquired Inventory on the Closing Date, as finally determined in the manner provided in this Section 3.2 (x) is less than the Acquired Inventory Benchmark (the amount by which such Acquired Inventory is less than the Acquired Inventory Benchmark, the "Inventory Shortfall"), the Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the Inventory Shortfall, or (y) is greater than the Acquired Inventory Benchmark (the amount by which such Acquired Inventory is greater than the Acquired Inventory Benchmark, the "Inventory Excess"), the Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the Inventory Excess. Promptly after the final determination of the Acquired Inventory pursuant to this Section 3.2, but in any event no more than five (5) business days after such determination, (x) the Escrow Holder shall pay to Buyer from the Purchase Price Adjustment Deposit, an amount equal to the Inventory Shortfall, if any, and (y) Buyer shall pay to Seller an amount equal to the Inventory Excess, if any.

(e)     If Buyer and Seller cannot agree on the amount of any adjustment required by this Section 3.2, Buyer or Seller, as applicable, shall pay to the other the undisputed portion of the adjustment, and any disputed amount shall be deposited with an escrow holder reasonably satisfactory to Buyer and Seller (the "Escrow Holder") to be held by the Escrow Holder until the dispute is resolved by the Bankruptcy Court as contemplated in Section 3.2(b) and then disbursed as directed by the Bankruptcy Court. Buyer and Seller agree that any disputes concerning the Adjustment shall be based on positions that are reasonable and in good faith.

Section 3.3     Allocation of Purchase Price. Buyer shall prepare and deliver to Seller a schedule (the "Allocation Schedule") allocating the Purchase Price and the Assumed Liabilities (and all other capitalized costs) among the Purchased Assets in accordance with Section 1060 of the Code and any corresponding requirements of any

state or local Tax Laws as soon as practicable after the Closing Time, and in no case later than forty-five (45) days before the due date, including available extensions, for filing any Tax Returns with respect to the Allocation Schedule. Seller will have the right to raise reasonable objections to the Allocation Schedule within ten (10) Business Days after their receipt thereof, in which event Buyer and Seller will negotiate in good faith to resolve such objections. If Buyer and Seller cannot mutually resolve Seller's reasonable objections to the Allocation Schedule within ten (10) Business Days after Buyer's receipt of such objections, such dispute with respect to the Allocation Schedule shall be presented to an Independent Accounting Firm, on the next day for a decision that shall be rendered by such Independent Accounting Firm within thirty (30) days thereafter and shall be final and binding upon each of the parties. The fees, costs and expenses incurred in connection therewith shall be shared in equal amounts by Buyer, on the one hand, and Seller, on the other. Buyer and Seller each shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594) consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or any other proceedings).

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

Section 4.1    Brokers and Finders.  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any Seller Entity.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

Section 5.1    Organization and Good Standing.  Buyer is a corporation validly existing and in good standing under the laws of its jurisdiction of formation, and has full corporate power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

Section 5.2    Execution and Effect of Agreement.  Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and the performance of Buyer's obligations hereunder have been duly authorized by all necessary corporate action on the part of

Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Approval Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 5.3    No Contravention. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate or conflict with any provision of Buyer's certificate of formation, (ii) (with or without the giving of notice or the lapse of time or both) violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any material Contract to which Buyer is a party or by which it is bound, or (iii) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer.

Section 5.4    Third Party Approvals. The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have not been obtained by Buyer.

Section 5.5    Brokers and Finders. No broker, finder, investment banker, financial advisor, consultant or intermediary is entitled to a broker's, finder's, financial advisor's or similar fee or commission which is payable by Buyer in connection with the transactions contemplated by this Agreement or upon the consummation of the transaction contemplated hereby, or if the Closing does not occur.

Section 5.6    Funds. Buyer, as of the Closing Time, will have sufficient unrestricted funds to consummate the transactions contemplated by this Agreement.

## ARTICLE VI

## COVENANTS OF THE PARTIES

Section 6.1    Conduct of Business Pending the Closing. Except as required pursuant to Order of the Bankruptcy Court or as restricted by virtue of the fact that Seller is a debtor under the Bankruptcy Code or by a budget for Seller's operations and activities hereafter approved by the Bankruptcy Court in the Case, during the period from the Initial Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall use all commercially reasonable efforts to carry on the Business in the ordinary course of business and, to the extent consistent therewith, use all commercially reasonable efforts to preserve the Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business, it being expressly understood and agreed that any loss of goodwill or customer relationships resulting from the winding down and closing of other facilities and

26

operations of Sellers not included among the Purchased Assets shall not be deemed a violation of any covenant of Seller set forth herein. Without limiting the generality of the first sentence of this Section 6.1, but subject to any Order of the Bankruptcy Court or any restriction imposed on Seller by virtue of the fact that Seller is a debtor under the Bankruptcy Code or by the budget for Seller's operations and activities and hereafter approved by the Bankruptcy Court in the Case, during the period from the Initial Agreement Date through the earlier of the Closing Time or any termination of this Agreement, Seller shall not without the prior written consent of Buyer:

(a) abandon any rights under any of the Contracts, Property Leases, Equipment Leases or Intellectual Property necessary for the Business or any Acquired Intellectual Property terminate, reject, amend, modify or supplement the terms of any Contract, Property Leases, Equipment Leases or Intellectual Property necessary for the Business or any Acquired Intellectual Property; provided, however, nothing herein shall be deemed to preclude Seller from rejecting, in its sole discretion, severance or other employment related agreements with former executives, including, without limitation, Ken Hardin, or that certain real property lease with respect to property formerly occupied by Seller in Oakland, California (collectively, the "Permitted Rejection Contracts");

(b) other than sales of Inventory in the ordinary course of business or the disposition of obsolete equipment, lease, license, surrender, relinquish, reject, sell, transfer, convey, assign, abandon or otherwise dispose of any Purchased Assets or shut down any of the Seller's Plants other than the Clinton Plant;

(c) fail, subject in all respects to (i) the budget applicable to Seller's operations during the pendency of the Case, (ii) the provision of an adequate supply of raw materials to Seller and, with respect to those raw materials Seller is currently procuring, Seller shall have made all commercially reasonable efforts to procure such raw materials, and (iii) Seller's manufacturing capacity to operate the Business in the ordinary course for the supply of customers with FR Product in the ordinary course of business upon the same terms historically agreed to between the Seller and its current customers for such material and in accordance with specifications for material and blend supplied to Buyer or any of its Affiliates by Seller;

(d) fail to use commercially reasonable efforts to maintain or acquire Inventory of the types and amounts consistent with the ordinary course of the Business;

(e) institute, settle or agree to settle any material litigation, action or Proceeding before any court or Governmental Entity relating to the Purchased Assets, or modify in any manner that is materially adverse to the Business or the Purchased Assets, rescind or terminate any material Permit, excepting (i) any litigation settlement regarding claims of general unsecured creditors in the Cases which are unrelated to any interest of Seller in any Purchased Assets, and (ii) any monetary claims held by Seller other than the claims being acquired by Buyer under this Agreement;

(f) transfer or grant any rights under, modify any existing rights under, or enter into any settlement regarding the breach or infringement of, or permit to lapse,

27

provide any notice, make any filing, or, to the extent applicable, subject to the cap on the amount of Seller's Cure Payment, fail to pay any fee necessary to maintain any Acquired Intellectual Property;

(g)     terminate, cancel or amend any insurance coverage maintained with respect to any Purchased Assets;

(h)     except as approved by Buyer (which approval shall not be unreasonably withheld or delayed), outside the ordinary course of business (i) increase in any manner the compensation or benefits of, or pay any bonus or other supplemental or incentive payment to, any such employee other than any management incentive plan approved by the Bankruptcy Court in the Case, (ii) grant any severance or termination pay (other than pursuant to existing agreements of Seller in effect on the Initial Agreement Date), to, or enter into any severance agreement with, any such employee, unless such severance is conditioned upon employee's employment having been terminated by Seller and such employee's not being offered employment with Buyer or any other employer, (iii) establish, adopt, enter into or amend any Benefit Plan or other arrangement of Seller, except as may be required to comply with applicable Law, (iv) grant to any such employee any awards under any bonus, incentive, performance or other compensation plan or arrangement or Benefit Plan or other arrangement, (v) hire or discharge any such employee that earns in excess of $30,000 per year, or (vi) terminate any such employee other than for cause;

(i)     fail to use commercially reasonable efforts to prevent any material change in its relationships with its material suppliers that relates to the Business, other than in the ordinary course of business consistent with past practice;

(j)     fail to use commercially reasonable efforts to maintain in good repair their business premises, fixtures, machinery, furniture and equipment at the Seller Plants other than the Clinton Plant in a manner consistent with prudent business practice;

(k)     enter into any license, lease, sublease or any other form of occupancy agreement with respect to any Seller Plant other than the Clinton Plant or any agreement for the disposition, purchase or acquisition of any Seller Plant other than the Clinton Plant, or cause a lessor or sublessor to accelerate or prepay any rent or any landlord allowances with respect to any Seller Plant other than the Clinton Plant;

(l)     modify, amend, terminate, assign, sublet or extend the term of any Property Lease or Equipment Lease related to the Business unless Buyer has provided its written consent to such transaction, which consent shall not be unreasonably withheld; provided, however, that with respect to each such Property Lease and Equipment Lease, Seller shall provide Buyer with at least thirty (30) days' written notice prior to the expiration of any period within which a renewal option for such lease shall expire;

(m)     except as set forth on Schedule 6.1(m), enter into, modify, amend, terminate, assign, extend or permit any renewal notice period or option to lapse with respect to (i) any Contract (or series of related Contracts) related to the Business that

28

contains consideration to be given or performed by Seller of a value exceeding $50,000 or (ii) any Contract (or series of related Contracts) related to the Business that is not terminable by Seller, as is party thereto, on 30 days' or less notice without penalty; or

(n)     subject to Seller's ability to enter into an Alternative Transaction in accordance with the provisions of this Agreement, enter into any Contract to do any of the foregoing.

This Section 6.1 as well as any representation, warranty, covenant, schedule or closing condition contained in this Agreement shall not apply to any Excluded Assets, except, however, to the extent a provision of this Section 6.1 or such representation, warranty, covenant, schedule or closing condition makes specific reference to an Excluded Asset (or category of Excluded Assets) or to operations relating to an Excluded Asset (or category of Excluded Assets).

Section 6.2     Bankruptcy Court Order. Seller shall use commercially reasonable efforts to obtain, through the filing with the Bankruptcy Court of appropriate applications or motions (the "Sale Motion"), entry of an Order granting the Approval Order, on or before August 20, 2008 and following notice to creditors and parties in interest in accordance with the Bankruptcy Code and Bankruptcy Rules.

Section 6.3     Notification of Certain Matters. Seller shall give Notice to Buyer no later than one (1) Business Day after any of the following are received of (i) any written notice or other communication from any Person alleging that the consent of such Person, which is or may be required in connection with the transactions contemplated by this Agreement, is not likely to be obtained prior to Closing, and (ii) any written objection or Proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order. Seller shall give Notice to Buyer no later than one (1) Business Day following Seller's receipt of written notice of any of the following: (i) any notice of any alleged violation of Law applicable to the Seller of which it has Knowledge; (ii) any written notice of the commencement of any investigation, inquiry or review by any Governmental Entity with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of Seller, is contemplated; (iii) the infringement or unauthorized use by any Person of any Acquired Intellectual Property (of which Seller has Knowledge); (iv) the resignation of any Key Employees or 10% or more of the employees at any Seller Plant other than the Clinton Plant; (v) any destruction or significant damage to any Seller Plant other than the Clinton Plant and any Equipment contained therein, whether caused by natural disaster or otherwise; and (vi) the execution of any Material Contract (and Seller shall deliver or make available a copy thereof to Buyer). Buyer shall give prompt Notice to Seller, and Seller shall give prompt Notice to Buyer, in the event that either party becomes aware of any event which would reasonably be expected to (i) have a Material Adverse Effect or (ii) provide such party with the ability to terminate the Agreement pursuant to 9.1(b)(iii) or 9.1(c)(iii), as applicable.

Section 6.4    <u>Access</u>.

(a)    Subject to applicable Law, from the Initial Agreement Date until the earlier of the Closing Time and any termination of this Agreement, Seller (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel (other than counsel to Seller in connection with the Cases) and other representatives, books and records of Seller, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such persons reasonably request, and (iii) shall instruct Seller's employees, counsel and financial advisors to cooperate with Buyer in its investigation of the Business. In addition, with Seller's consent, which consent shall not be unreasonably withheld, Buyer shall have the right to contact Seller's landlords, lessors, suppliers and other third parties with respect to any Purchased Assets or Assumed Liabilities.

(b)    From and after the Closing Time, Seller shall give Buyer and Buyer's Representatives reasonable access during normal business hours to the offices, facilities, plants, properties, officers, employees, books and records of Seller pertaining to the Business, and Seller shall cause their Representatives to furnish to Buyer such financial, technical, operating and other information pertaining to the Business as Buyer's Representatives shall from time to time reasonably request and to discuss such information with such Representatives.

(c)    During the period from the Closing Time until the closing of the Cases (the "<u>Post-Closing Cooperation Period</u>"), (i) the Buyer shall permit Seller's counsel and other advisers and any successor to Seller and its professional advisers (collectively, "<u>Permitted Access Parties</u>") access to the financial and other books and records relating to the Business for all periods preceding the Closing Time, to the extent that such books and records are transferred to the Buyer at Closing. Such access shall be provided upon written notice from Seller and during Buyer's normal business hours, and only to the extent such access does not interfere with or disrupt Buyer's normal business operations. Such access shall include (a) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the costs and expenses thereof. During the Post-Closing Cooperation Period, Buyer shall make designated personnel available to assist Seller with accessing information reasonably required for Seller's post-Closing Time activities (including, without limitation, preparation of tax returns), provided that such access does not interfere with the Buyer's business operations.

Section 6.5    Leases.

(a)    Capital Equipment Leases.  Subject to the Approval Order and Buyer's payment of the Capital Equipment Lease Payoff, at Closing, Seller shall (i) assume the Capital Equipment Leases, (ii) cure any and all defaults and breaches under and satisfy any Liability arising from or relating to pre-Closing periods under the Capital Equipment Leases, (iii) purchase from the lessors under the Capital Equipment Leases all of the Equipment leased by Seller pursuant thereto and (iv) transfer such Equipment to Buyer free and clear of all rights of such lessors and of all Liens at Closing as contemplated in Articles II and III of this Agreement.

(b)    Real Property Leases.

(i)    Subject to the Approval Order and satisfaction of Buyer's obligations under this Section 6.5(b), until November 11, 2008 or such earlier date with respect to each Real Property Lease as Buyer may elect and notify Seller in writing at least fifteen (15) days in advance (such period of time with respect to each Seller Plant, the "Plant Lease Maintenance Period"), Seller shall (A) (i) refrain from rejecting, (ii) satisfy any Liability arising on or after the Petition Date or relating to Post-Petition Periods under, (iii) comply in all material respects with all of the terms and provisions of, (iv) fulfill all of its obligations under and (v) use commercially reasonable diligent efforts to maintain in full force and effect each Real Property Lease other than the Real Property Leases for the Clinton Plant and (B) permit all Purchased Assets located at Closing at the Seller Plant subject to such lease to remain on the premises of such plant until Buyer elects to remove such Purchased Assets, which shall in no event occur later than the last day of the Plant Lease Maintenance Period.

(ii)    Promptly following the Closing (but in no event later than September 2, 2008), Seller shall file with the Bankruptcy Court appropriate applications or motions to obtain one or more Orders permitting Seller to extend the "November 11, 2008" date set forth in Paragraph 6.5(b)(i) to February 9, 2009 with respect to each Seller Plant other than the Clinton Plant and shall use commercially reasonable efforts (including reasonably negotiating with the lessors under such Real Property Leases to obtain their consent) to obtain such Order or Orders.  The "November 11, 2008" date set forth in Paragraph 6.5(a)(i) with respect to each Seller Plant shall be extended to the extent set forth in any such Order or Orders issued by the Bankruptcy Court applicable to that Seller Plant.

(iii)    During the Plant Lease Maintenance Period for each Seller Plant other than the Clinton Plant, (I) Seller shall (y) avoid causing, and use commercially reasonable efforts to prevent any third party from causing, any damage or casualty to the Equipment located in such Seller Plant; provided, however, notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that Buyer shall bear the risk of loss with the respect to all such Equipment following the Closing, and (z) maintain physical security of

31

such Seller Plant substantially as such physical security is maintained as of the date of this Agreement if Seller can maintain such security without incurring any significant cure obligation, otherwise permit Buyer to maintain physical security at such Seller Plant at Buyer's expense, and (II) Buyer shall pay to Seller, in advance, on the first day of each calendar month during the Plant Lease Maintenance Period for that Seller Plant (pro rated for any portion of a month, but only to the extent that Seller will not be obligated to bear the prorated portion for which Buyer would not be obligated) an amount equal to Seller's reasonably-documented, estimated ordinary course, reasonable monthly out-of-pocket costs and expenses under the Real Property Lease for that Seller Plant that relate solely to the Plant Lease Maintenance Period and all other ordinary course out of pocket costs and expenses of Seller incurred with respect to maintaining the Seller Plants that are subject to the Plant Lease Maintenance Period (collectively, the "Run Rate Costs"). Not later than the fifteenth (15th) day of each month of the Plant Lease Maintenance Period (starting with the second month thereof), Buyer and Seller shall reconcile between them, based upon reasonable documentation provided by Seller, the actual Run Rate Costs for the immediately preceding month for each Seller Plant that is the subject of the Plant Lease Maintenance Period. So that there may be no misunderstanding and without limiting the foregoing, Buyer and Seller acknowledge that the following prepaid amounts and property taxes are part of the Purchase Price set forth in Section 3.2(a) and are not expenses to be reimbursed by Buyer under this Section 6.5(b):

- (A) $1,101 of prepaid property insurance paid to Realty Associates;

- (B) $7,909 of prepaid air quality permits for Equipment at Seller's Plant in Carson, California paid to SCAQMD;

- (C) $125,598 of property taxes prepaid to St. Clair County, Illinois;

- (D) $125,598 of property taxes due to be paid to St. Clair County, Illinois on or about September 3, 2008;

- (E) $25,000 security deposit for Mid-America Fiber Company's Real Property Lease;

- (F) $11,483 of prepaid expenses for Florida Nonwovens, Inc.'s Real Property Lease; and

- (G) $7,808 for the 2009 Sandmat Trade Show registration for the Golf Industry Show.

(iv) So that there may be no misunderstanding, regardless of whether the Bankruptcy Court issues any Orders as contemplated in Section 6.5(a)(ii), the Buyer may terminate the Plant Lease Maintenance Period with respect to any Seller Plant at any time prior to November 11, 2008, as such date may be

extended by Order of the Bankruptcy Court as contemplated in Paragraph 6.5(b)(ii), upon not less than fifteen days' written notice to Seller, and Buyer's and Seller's obligations under this Section 6.5(b) shall cease with respect to that Seller's Plant on the date that is fifteen (15) days following Seller's receipt of such written notice.

(v)     Seller shall either (A) refrain from selling the Seller Plant owned by Seller and located at St. Louis, Missouri prior to February 9, 2009 (or such earlier date as Buyer may elect and notify Seller in writing at least fifteen (15) days in advance) and permit Buyer to maintain any Purchased Assets at such plant as though it were a leased plant subject to the provisions of Sections 6.5(b)(i) through 6.5(b)(iv), or (B) require any purchaser of such plant to permit Buyer to maintain Purchased Assets at such plant and require any purchaser of such plant to fulfill Seller's obligations with respect to such plant until February 9, 2009 (or such earlier date as Buyer may elect and notify Seller or such purchase, as applicable, in writing at least fifteen (15) days in advance) as though it were leased by Seller and subject to the provisions of Sections 6.5(b)(i) through 6.5(b)(iv) above. Buyer shall pay to Seller or any purchaser of such plant (the "St. Louis Plant"), as applicable, on the first day of each calendar month, in advance, during the period prior to February 9, 2009 (or such earlier date as Buyer may elect and notify Seller or such purchase, as applicable, in writing at least fifteen (15) days in advance) (pro rated for any portion of a month, but only to the extent that Seller will not be obligated to bear the prorated portion for which Buyer would not be obligated) an amount equal to Seller's or such purchaser's estimated Run Rate Costs to maintain such plant for such period that relate solely to that period. Not later than the fifteenth (15th) day of each month of such period (starting with the second month thereof), Buyer and Seller shall reconcile between them, based upon reasonable documentation provided by Seller, the actual Run Rate Costs for the immediately preceding month.

(vi)    Buyer shall indemnify, defend and save and hold harmless Seller and its Affiliates, landlords, agents, representatives, employees, officers and directors, and invitees (collectively, "Indemnitees") of and from any and all loss, liability, damages, claims, actions, causes of action and costs and expenses (including, without limitation, court costs and attorneys' fees) (collectively, "Liability") suffered or incurred by any Indemnitee as a result of property damage to any Seller Plant or personal injury incurred by any Person on or about the premises of any Seller Plant or otherwise resulting from the acts or omissions of Buyer and/or any of its employees, agents, representatives or invitees during the Plant Lease Maintenance Period for that Seller Plant or the period specified in Section 6.5(b)(v) above, as to the St. Louis Plant (including, without limitation, any of the foregoing resulting from Buyer's packing or removal of the Equipment); other than to the extent that any of the foregoing result from the gross negligence or willful misconduct of any Indemnitee or from Seller's breach of its obligations under this Section 6.5(b); provided, however, Buyer's obligations under this Section 6.5(b)(vi) shall not cover or apply to Liability to the extent such Liability relates to any period or arises out of events that occurred

33

prior to the Closing Date. Without limiting the survival of any other provision of this Agreement, the obligations of this Section 6.5(b) shall survive the Closing and the expiration of the Plant Lease Maintenance Period and the expiration of the period set forth in Section 6.5(b)(v) as to the St. Louis Plant.

Section 6.6    Confidentiality; Privacy.

(a)    Seller will treat and hold as confidential all of the Confidential Information and will not, directly or indirectly, without the prior written consent of Buyer, disclose or use any Confidential Information except in connection with this Agreement and as provided in paragraph (i) to this Section 6.6(a) and except that in no event shall historical information relating to Seller's operations or activities reasonably utilized by Seller in filings in the Case be deemed or treated as "Confidential Information" for purposes of this Agreement.

(b)    Seller's obligation not to disclose Confidential Information shall not apply to Confidential Information that Seller determines, in consultation with counsel, is required to be disclosed by Law; provided, however, that Seller shall notify Buyer as promptly as possible (and, if possible, prior to making such disclosure) so that Buyer may seek confidential treatment or protection of such Confidential Information.

(c)    Notwithstanding anything else in this Agreement, all parties to this Agreement hereby agree and acknowledge that each of them (and each of their employees, representatives or other agents) is authorized to disclose to any and all Persons, beginning immediately upon commencement of their discussions and without limitation of any kind, the United States federal income tax treatment and tax structure of the transactions contemplated by this Agreement, and all materials of any kind (including opinions or other tax analyses) that are provided by either party to the other relating to such United States federal income tax treatment and tax structure, except to the extent that such disclosure is subject to restrictions reasonably necessary to comply with securities laws.

Section 6.7    Public Announcements. From the Initial Agreement Date until the earlier of the Closing or the termination of this Agreement, the Seller will give Buyer the opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the transactions contemplated hereby, or other public statements with respect to the transactions contemplated by this Agreement, and Seller shall not issue any such press release without the prior written approval of Buyer, in each case except as may be required by Law, court process or by obligations pursuant to any listing agreement with any national securities exchange. Seller shall use its commercially reasonable efforts to cause its Affiliates, employees, officers and directors to comply with this Section 6.7.

Section 6.8    Cure of Defaults. Subject to the Approval Order, Seller shall, on or prior to the Closing, cure, subject to the amount of the Seller's Cure Payment,

34

any and all defaults and breaches under and satisfy any Liability arising from or relating to pre-Closing periods under the Assumed Contracts, the Acquired Intellectual Property and the Capital Equipment Leases. Seller agrees that it will promptly take such actions as are necessary or desirable to obtain the Approval Order from the Bankruptcy Court.

Section 6.9 Employment Matters. Buyer or an Affiliate of Buyer may offer employment, in advance of and contingent upon Closing and effective as of the Closing Time, to such employees of Seller as determined by Buyer or an Affiliate of Buyer in its sole discretion on such terms as Buyer or an Affiliate of Buyer shall, determine in its sole discretion. Buyer shall not have any obligation to assume any severance, retention or other similar contractual provision of any employee of Seller who is offered employment by Buyer. Seller shall comply with any and all requirements of the WARN Act or any similar state law applicable to Seller in connection with the termination of any employees of Seller.

Section 6.10 Further Agreements. Seller shall use commercially reasonable efforts to deliver to Buyer any mail or other communication received by Seller after the Closing Time pertaining to the Purchased Assets, the Business or the Assumed Liabilities, and any cash, checks or other instruments of payment in respect thereof. Buyer shall use all commercially reasonable efforts to promptly deliver to Seller any mail or other communication received by it after the Closing Time pertaining to the Excluded Assets or any Excluded Liabilities, and any cash, checks or other instruments of payment in respect thereof. From and after the Closing Time, Seller shall use all commercially reasonable efforts to refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Buyer, and Buyer shall use all commercially reasonable efforts to refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

Section 6.11 Payment of Transfer Taxes and Tax Filings. All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne one-half by Buyer and one-half by Seller. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Approval Order or, at Closing, Seller or Buyer, as appropriate, provides an appropriate resale exemption certificate or other evidence acceptable to Buyer or Seller, as appropriate, of exemption from such Transfer Taxes. Seller and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Seller shall pay all Transfer Taxes and shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer, and Buyer shall promptly reimburse Seller one-half thereof pursuant to the first sentence of this Section. Each party hereto shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the

preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

Section 6.12    Reserved.

Section 6.13    Proration of Taxes.  All personal property Taxes or similar *ad valorem* obligations (and no other Taxes) levied with respect to the Purchased Assets for any taxable period that includes a day before the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Buyer as of the Closing Date.  Seller shall be responsible for the payment of all such personal property Taxes or similar *ad valorem* obligations incurred or accrued through and including the Closing Date with respect to the Purchase Assets, and Buyer shall be responsible for the payment of all such personal property Taxes or similar *ad valorem* obligations incurred or accrued after the Closing Date with respect to the Purchased Assets.  If any such Taxes subject to proration are paid by Buyer, on the one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

Section 6.14    Reasonable Efforts; Notification.

(a)    Each of the parties will use all reasonable efforts to take, or cause to be taken, all actions and use all reasonable efforts to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things which to its Knowledge are necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including: (i) the obtaining of all other necessary actions, non-actions, waivers, and Permits from Governmental Entities and the making of all other necessary registrations and filings, (ii) the obtaining of all consents from the Consent Parties, if any, and (iii) in each case to the extent the same do not expand the rights and obligations of the applicable party pursuant to the other provisions of this Agreement, the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the transactions contemplated by this Agreement.

(b)    Except as required by Law, each party hereto shall promptly inform the other of any communication from any Governmental Entity regarding any of the transactions contemplated by this Agreement.  If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Entity with respect to the transactions contemplated by this Agreement, then such party will use its reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.

Section 6.15    Rejected Contracts.  Seller shall not reject any Material Contract, Real Property Lease, Capital Equipment Lease, Assumed Contract or Acquired Intellectual Property prior to Closing without the prior written consent of Buyer.

Section 6.16     Adequate Assurances.  Buyer will use commercially reasonable efforts to provide Seller with information regarding Buyer's intended business plans on and after the Closing Time, and shall cooperate with Seller in communicating with third parties to Assumed Contract and Acquired Intellectual Property as may be reasonably necessary to assist Seller in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Acquired Intellectual Property (collectively, "Assumed Agreements").  Buyer shall be fully responsible for providing evidence at the Sale Hearing of such adequate assurance of future performance with respect to all of the foregoing, it being understood and agreed that Buyer shall bear the risk of any failure to satisfy such requirement and Buyer's obligations to close the transaction hereunder shall not be conditioned upon the assumption and assignment of any Assumed Agreement that can not be assumed and assigned by reason of such failure to provide adequate assurance of future performance as required herein.

Section 6.17     Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Time, Seller shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, as shall be reasonably requested to vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets.  Seller shall take such reasonable steps as may be reasonably necessary or appropriate at and after the Closing, so that Buyer shall be placed in actual possession and operating control of the Purchased Assets.  Seller shall provide copies or otherwise make available to Buyer and Buyer's Representatives, all information and records (financial and otherwise) relating to, or otherwise used or useful in the Business, and not otherwise included in the Purchased Assets.

Section 6.18     Post-Closing Reconciliation.  With respect to any and all amounts received or collected from and after the Closing by the Seller attributable to, or in respect of, any of the Purchased Assets or by Buyer attributable to, or in respect of, any of the Excluded Assets, Seller or Buyer, as the case may be, shall (i) hold such amounts in trust for and on behalf of the other party, (ii) provide prompt notice of such receipt or collection to the other party, (iii) pay promptly (and in any event within 2 Business Days of their receipt or collection) to the other party any and all such amounts so received or collected by wire transfer of immediately available funds to an account or accounts designated by the other party or by other means acceptable to the other party.

Section 6.19     Assignment Assistance.  To the extent that any debtor other than Seller owns any property, assets, rights, titles or interests of any kind and nature used exclusively in connection with the Business or located at the Seller Plants other than the Clinton Plant, Seller hereby covenants that it will (and it will cause such other debtors to), from time to time, prior to or subsequent to the Closing, without further consideration, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all further acts, conveyances, transfers, assignments and assurances as reasonably may be required to convey or transfer to Buyer any such property, assets, rights, titles or interests.

# ARTICLE VII

## CONDITIONS TO OBLIGATIONS OF THE BUYER

Section 7.1    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Time of each of the following conditions:

(a)    Performance of Obligations.  Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Time.

(b)    Officer's Certificate.  Buyer shall have received a certificate, dated the Closing Time, of an appropriate officer of Seller to the effect that the conditions specified in Section 7.1(a) above have been fulfilled.

(c)    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered an Order or Orders (the "Approval Order") on or before August 20, 2008, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, with such changes only as are mutually approved by Buyer and Seller: (A) the execution, delivery and performance by Seller of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein free and clear of all Liens, claims and interests, in, to and under each and all of the Purchased Assets, and (C) the performance by Seller of its obligations under this Agreement; (ii) authorizes and directs Seller to assume and assign to Buyer the Assumed Contracts and the Acquired Intellectual Property; and (iii) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code.  The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified.  To the extent the same may not be transferable pursuant to applicable law, the Approval Order may exclude approval of the sale of the Purchased Assets that are not necessary to the operation of the Business.  Seller shall have delivered to Buyer (i) a certified copy of the Order or Orders providing for Bankruptcy Court approval, and (ii) copies of all affidavits of service of Seller's motion seeking the Approval Order or notice of such motion filed by or on behalf of Seller.

(d)    [RESERVED]

(e)    Assumed Contracts and Leases.  All of the Assumed Contracts and Acquired Intellectual Property, in each case subject to appropriate showing of adequate assurance of future performance by Buyer, cure, if applicable, in accordance with the provisions of Section 6.5(a) and Section 6.8 hereof, and applicable law shall (i) be in full force and assignable to and assumable by Buyer without the consent of the other party thereto pursuant to Section 365 of the Bankruptcy Code or consent thereto shall have been obtained, and (ii) have had all of Seller's breaches, defaults and Liabilities

38

thereunder arising from or relating to pre-Closing periods satisfied and cured in accordance with Section 6.5(a), if applicable, and Section 6.8 hereof.

(f) No Material Adverse Change. Since the Initial Agreement Date, no event, occurrence, fact, condition, change, development or effect shall have occurred or shall exist that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(g) No Violation of Law or Orders. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that (i) prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement or (ii) would adversely affect or interfere with the operation of the Business in a manner that would constitute a Material Adverse Effect.

(h) Purchased Assets. No properties, assets and rights used or held by Seller for use in the Business, or owned by Seller (and not an Excluded Asset or which does not become an Excluded Asset pursuant to the other provisions hereof) as are necessary to conduct the Business, shall be excluded from the Purchased Assets due to Seller's inability to assign such Contracts, properties, assets or rights, whereby the non-assignability thereof, individually or in the aggregate, would reasonably be expected to constitute a Material Adverse Effect.

(i) Equipment Buyout. Seller shall have purchased from the lessors under the Capital Equipment Leases all of the Equipment leased by Seller pursuant thereto so that such Equipment may be transferred to Buyer free and clear of all rights of such lessors and of all Liens at Closing as contemplated in Articles II and III and Section 6.5(a) of this Agreement.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE SELLER

Section 8.1    Conditions Precedent to the Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Time of each of the following conditions:

(a) Accuracy of Representations and Warranties. The representations and warranties of Buyer contained herein shall be true and correct in all material respects on the Initial Agreement Date and shall be true and correct in all respects on and as of the Closing Time, with the same force and effect as though such representations and warranties had been made on and as of the Closing Time, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date; provided, however, that the failure of any such representations or warranties to be true and correct on and as of the Closing Time shall not constitute a basis for Seller to refuse to consummate the transactions contemplated hereby unless such failure, either individually

or in the aggregate, has or would reasonably be expected to have a material and adverse affect on Buyer's ability to perform its obligations under this Agreement.

(b)  Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Time.

(c)  Officer's Certificate.  Seller shall have received a certificate, dated the Closing Time, of an officer of Buyer to the effect that the conditions specified in Section 8.1(a) and (b) above have been fulfilled.

(d)  Approval Order.  The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified.

(c)  No Violation of Law or Orders.  No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement.

(f)  Seller's Cure Payment shall not exceed $150,000; provided that if the aggregate Cure Amount to satisfy Seller's cure obligations under this Agreement would exceed $150,000, Buyer shall have the right but not the obligation to (i) designate which Cure Amounts Seller must cure with Seller's Cure Payment of $150,000 and (ii) pay all other Cure Amounts with Buyer's funds and if Buyer exercises and fulfills its rights under this Section 8.1(g), then the conditions of this Section 8.1(g) shall be deemed satisfied. For the avoidance of doubt, if Buyer elects not to so pay any Cure Amounts in excess of $150,000, Buyer shall nevertheless be obligated to consummate the transactions contemplated herein and Seller shall have no obligation to assume or assign to any Assumed Contracts with respect to which cure obligations are not covered by the Cure Amounts Buyer designates to be made with Seller's $150,000 Cure Payment.

(g)  Seller shall have purchased from the lessors under the Capital Equipment Leases all of the Equipment leased by Seller pursuant thereto so that such Equipment may be transferred to Buyer free and clear of all rights of such lessors and of all Liens at Closing as contemplated in Articles II and III and Section 6.5(a) of this Agreement.

## ARTICLE IX

## TERMINATION

Section 9.1  Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)  by written agreement of Seller and Buyer;

(b) by Buyer:

(i) if Buyer's bid is chosen as the winning bid in any auction for the sale of the Purchased Assets, (A) at any time after August 20, 2008, if the Approval Order shall not have been entered or (B) at any time after August 25, 2008, if the Approval Order shall have been entered by August 20, 2008 but the Closing shall not have occurred; provided, however, that Buyer is not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder (including, without limitation, Buyer's obligation to close pursuant to Section 3.1 hereof);

(ii) if Buyer's bid is chosen as the second highest and best bid in any auction for the sale of the Purchased Assets, on the earlier to occur of the (A) the closing date of an Alternate Transaction, or the later to occur of (B)(i) August 25, 2008, or (ii) fifteen (15) days after the date on which the Bankruptcy Court enters an order approving an Alternate Transaction to a purchaser other than Buyer;

(iii) if Buyer's bid is not chosen as the winning bid, or the second highest and best bid in any auction for the sale of the Assets by August 20, 2008, on August 20, 2008;

(iv) if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order; or

(v) if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement and in respect of representations and warranties, notice of which has been provided to Seller prior to the Closing, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by the Company.

(c)     by Seller:

(i)     at any time after August 25, 2008, if the Closing shall not have occurred; provided, however, that Seller is not in material and willful breach of any of its representations and warranties contained in this Agreement, or has failed in any material respect to perform any of its obligations hereunder (including, without limitation, Seller's obligation to close pursuant to Section 3.1 hereof);

(ii)    if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

(iii)   if there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, to the extent that the same have not theretofore lapsed or been terminated in accordance with the other provisions of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Buyer;

(iv)    at any time after August 20, 2008 if the Approval Order shall not have been entered; or

(v)     upon the closing of an Alternate Transaction.

Section 9.2    Consequences of Termination. If this Agreement is terminated under Section 9.1, written notice thereof will forthwith be given to the other party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or liability of Seller or Buyer to the other, except that:

(a)     each party will return or destroy all documents, workpapers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the party furnishing the same;

(b)     if this Agreement is terminated by Buyer pursuant to Section 9.1(b) or by Seller pursuant to Section 9.1(c), other than a termination pursuant to Section 9.1(c)(iii), Buyer shall be entitled to receive, and, to the extent necessary Seller shall cause the Escrow Agent to return to Buyer, the Deposit Escrow within two (2) Business Days of the date of termination of this Agreement. Additionally, in the event the Purchased Assets are sold to a purchaser other than Buyer other than following a termination of this Agreement pursuant to Section 9.1(c)(iii), the Escrow Deposit shall be returned to Buyer within five (5) business days after the closing of such sale;

42

(c)　　if this Agreement is terminated by Seller pursuant to Section 9.1(c)(iii), Seller shall be entitled to receive, and, to the extent necessary Buyer shall cause the Escrow Agent to deliver to Seller, the Deposit Escrow within two (2) Business Days of the date of termination of this Agreement;

(d)　　notwithstanding the foregoing, this Section 9.2 and Section 6.8 (Public Announcements), Section 10.1 (Expenses), Section 10.5 (Notices), Section 10.6 (Choice of Law), Section 10.8 (Acknowledgment and Release), Section 10.12 (Exclusive Jurisdiction), Section 10.13 (Waiver of Right to Trial by Jury) and Section 10.14 (Beneficiaries) shall survive any such termination of this Agreement.

(e)　　The parties hereby agree that it is impossible to determine accurately the amount of damages that Seller would suffer if the transactions contemplated herein were not consummated as a result of a material breach of this Agreement by Buyer, or that Buyer would suffer if the transactions contemplated herein were not consummated as a result of a material breach by Seller. As a result, notwithstanding anything in this Agreement to the contrary, the parties hereby agree that the payment of the Deposit Escrow to Seller shall be Seller's liquidated damages against Buyer and shall be the sole and exclusive remedy of Seller against Buyer in the event of any breach or default by Buyer of this Agreement or the terms thereof, and, to the extent payable, the payment of the Deposit Escrow shall serve as liquidated damages against Seller and shall be the sole and exclusive remedy of Buyer against Seller.

## ARTICLE X

## MISCELLANEOUS

Section 10.1　　Expenses. Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby. As between Buyer and Seller, Seller shall bear all costs of any Persons (other than Buyer, its agents or Affiliates) entitled to reimbursement by the Bankruptcy Court.

Section 10.2　　Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, that Buyer may assign its rights and liabilities hereunder to one or more Affiliates of Buyer, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 10.3　　Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect

holder of any equity interests or securities of either Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either Seller or Buyer, nor any Representative, or controlling Person of each of the parties hereto and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

Section 10.4    Risk of Loss.

(a)    Casualty.  Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Time.  In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Time, then with respect to such Purchased Assets Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets with an adjustment to the Purchase Price as set forth below in this Section 10.4(a); or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 would not be satisfied.  If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, Seller will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

(b)    Condemnation.  In the event that any portion of the Purchased Assets is taken by eminent domain or condemnation prior to the Closing Time and such taking materially and adversely affects the use or utility of the Business, Buyer may within the later of (x) ten (10) days after it receives written notice of such taking or (y) August 21, 2008 either (i) proceed to close notwithstanding the eminent domain or condemnation proceeding, in which event Seller will assign to Buyer their entire right, title and interest in and to any award, with a reduction in the Purchase Price equal to the value of the Purchased Assets impacted by such proceeding; or (ii) exclude such Purchased Asset, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 is not satisfied or, if Buyer chooses to do so, purchase the remaining Purchased Assets with a reduction in the Purchase Price equal to the value of the remaining Purchased Assets subject to condemnation.  If Buyer closes notwithstanding a condemnation of any Purchased Asset, Seller will deliver and/or assign to Buyer any proceeds with respect to such condemnation.

Section 10.5    Notices.  All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile, addressed as set forth below, or to such other address as such party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile with confirmation of receipt; provided, that

if delivered or transmitted on a day other than a Business Day or after normal business hours, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to Seller: | Western Nonwovens, Inc.<br>966 E. Sandhill Avenue<br>Carson, CA 90746<br>Attention: Jonathan J. Nash<br>Fax: (310) 767-4048 |
| With a copy to: | Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19899<br>Attn: Laura Davis Jones, Esq.<br>Facsimile: (302) 652-4400 |
| If to Buyer: | Sylvan Chemical Co., Inc.<br>P. O. Box 1926<br>M-495<br>920 Milliken Road (29303)<br>Spartanburg, SC 29304<br>Attention: George P. Miller, Esq.<br>Fax: (864) 503-1999 |
| With a copy to: | Wyche, Burgess, Freeman & Parham, P.A.<br>44 E. Camperdown Way (29601)<br>Post Office Box 728<br>Greenville, SC 29602-0728<br>Attention: Kevin A Hendricks, Esq.<br>Fax: (864) 235-8900<br><br>And<br><br>Jones Day<br>77 West Wacker<br>Chicago, Illinois 60601-1692<br>Attention: Brad B. Erens, Esq.<br>Fax: (312) 782-8585 |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

Section 10.6   Choice of Law. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the state of New York, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

Section 10.7   Entire Agreement; Amendments and Waivers. This Agreement, the Escrow Agreement, and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all other prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and the Company, or in the case of a waiver, by the party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

Section 10.8   Acknowledgment and Release. Seller acknowledges and agrees that the Buyer is the sole Person bound by, or liable with respect to, the obligations and Liabilities of Buyer under this Agreement, and that no Affiliate of Buyer or any of its Subsidiaries other than Buyer, or any current or former officer, director, stockholder, agent, attorney, employee, Affiliate, advisor or consultant of Buyer or any such other entity shall be bound by, or liable with respect to, any aspect of the Agreement. Buyer acknowledges and agrees that the Seller is the sole Person bound by, or liable with respect to, the obligations and Liabilities of Seller under this Agreement, and that no Affiliate of Seller or any of its Subsidiaries other than Seller, or any current or former officer, director, stockholder, agent, attorney, employee, Affiliate, advisor or consultant of Seller or any such other entity shall be bound by, or liable with respect to, any aspect of the Agreement.

Section 10.9   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile or otherwise electronically. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

Section 10.10   Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

46

Section 10.11  Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 10.12  Exclusive Jurisdiction.  Without limiting any party's right to appeal any order of the Bankruptcy Court, during the Case: (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide (insofar as they relate to Seller) any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 10.5.

Section 10.13  WAIVER OF RIGHT TO TRIAL BY JURY.  SELLER AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

Section 10.14  Beneficiaries.  Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein.

Section 10.15  Counting.  If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

Section 10.16  Preparation of this Agreement.  Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

Section 10.17  Termination of Representations, Warranties and Covenants.  The representations, warranties and covenants (other than any covenant that by its express terms requires performance after the Closing Date) made by Seller and Buyer in this Agreement or pursuant to any other document delivered by such parties in connection herewith shall terminate on the Business Day immediately preceding the Closing Date, provided that the representation and warranty contained in Sections 4.1 and 5.5 (Brokers and Finders) and the covenants contained in Sections 3.3 (Allocation of Purchase Price), 6.4 (Access), 6.5 (Leases), 6.6 (Confidentiality; Privacy), 6.8 (Cure of

47

Defaults), 6.9 (Employment Matters), 6.10 (Further Agreements), 6.11 (Payment of Transfer Taxes and Tax Filings), 6.13 (Proration of Taxes and Certain Charges), 6.14 (Reasonable Efforts; Notification), 6.17 (Further Assurances), 6.18 (Post-Closing Reconciliation) and 6.19 (Assignment Assistance) shall survive indefinitely. Accordingly, without in any way limiting the foregoing, effective as of the Closing Time, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Buyer further acknowledges that, as of the Closing Time, Buyer will have conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, except only for such surviving representations, Buyer will accept the Purchased Assets at the Closing **"AS IS, "WHERE IS," and "WITH ALL FAULTS."**

**Signatures begin on following page.**

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

SYLVAN CHEMICAL CO., INC.

By:_____
    Name:
    Title:

WESTERN NONWOVENS, INC.

By:_____

    Name:
    Title:


WESTERN SYNTHETIC FIBER,
INC.

By:_____

    Name:
    Title:


MID-AMERICA FIBER COMPANY,
INC.

By:_____

    Name:
    Title:


FLORIDA NONWOVENS, INC.

By:_____

    Name:
    Title: